**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FEDERAL TRADE COMMISSION,

                         Plaintiff,

                         v.

ARDAGH GROUP, S.A.,
COMPAGNIE DE SAINT-GOBAIN, and
SAINT-GOBAIN CONTAINERS, INC.,

                         Defendants.

Case No. 1:13-CV-01021 (BJR)

**PUBLIC VERSION**

<u>**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS**</u>
<u>**MOTION FOR PRELIMINARY INJUNCTION**</u>

# REDACTED VERSION
# FOR PUBLIC FILING*

*The Federal Trade Commission files this non-confidential redacted version of its Memorandum of Law in Support of its Motion for Preliminary Injunction, filed August 28, 2013.  The Protective Order requires all information designated "Confidential" to be redacted from the public version of the pleading filed with the court.  Although Defendants designated all information and documents redacted in this Memorandum as "Confidential," most of the information does not appear to be commercial information, the disclosure of which would cause injury to their businesses.

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

STATEMENT OF FACTS ..................................................................................................5

   I.   Glass Containers Have Unique Attributes. ........................................................ 6

   II.   The Glass Container Industry Is Already Consolidated. ................................... 8

   III.  Ardagh And Saint-Gobain Compete With Each Other Today........................... 9

   IV.  Anchor Alleged A Relevant Product Market Of Glass Containers Only, Excluding Plastic and Metal.................................................................................................. 11

   V.   The Commission Challenges Ardagh's Acquisition Of Saint-Gobain. ............................ 12

ARGUMENT ....................................................................................................................12

   I.   THE FTC HAS RAISED "SERIOUS, SUBSTANTIAL" ISSUES APPROPRIATE FOR AN ADMINISTRATIVE TRIAL. ............................................................... 12

   II.   THE PROPOSED TRANSACTION IS PRESUMPTIVELY UNLAWFUL. ................. 15

      A.   Two Relevant Product Markets Are The Manufacture And Sale Of Glass Containers To (1) Beer Brewers And (2) Spirits Distillers............................................. 16

         1.   Defendants' and Third Parties' Documents And Actions Show That The Relevant Product Markets Include Only Glass Containers..................................... 19

         2.   Plastic Bottles And Metal Cans Are Not In The Relevant Product Markets. ........... 23

         3.   Case Law Supports The Commission's Definition Of The Relevant Product Markets.................................................................................................. 30

      B.   The Relevant Geographic Market Is The United States. ............................... 33

      C.   The Transaction Is Likely To Lead To Reduced Competition And Higher Prices. ..... 35

         1.   The Acquisition Is Presumptively Unlawful Because It Will Substantially Increase Concentration.................................................................................................. 35

         2.   The Acquisition Will Likely Result In Coordinated Anticompetitive Effects. ........ 36

         3.   The Acquisition Will Eliminate Head-to-Head Competition Between Ardagh and Saint-Gobain. ......................................................................................................... 40

   III.  DEFENDANTS' REBUTTAL ARGUMENTS FAIL, AND, AT BEST, RAISE ISSUES FOR RESOLUTION IN THE ADMINISTRATIVE TRIAL.......................................... 41

      A.   High Barriers To Entry And Expansion Exist In The Glass Container Industry.......... 42

      B.   Defendants' Efficiency Claims Are Largely Unfounded............................... 43

   IV.  THE PUBLIC INTEREST STRONGLY FAVORS PRELIMINARY RELIEF TO PRESERVE THE STATUS QUO. ……………………………………………………...44

CONCLUSION..................................................................................................................45

## TABLE OF AUTHORITIES

**CASES**

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) .......................................................... *passim*

*Eastman Kodak Co. v. Image Technical Servs. Inc.*, 504 U.S. 451 (1992) ................................. 32

\* *FTC v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26 (D.D.C. 2009) (Collyer, J.).................... *passim*

*FTC v. Coca-Cola Co.*, 641 F. Supp. 1128 (D.D.C. 1986), *vacated as moot*, 829 F.2d 191 (D.C. Cir. 1987) ............................................................................................................................. 2, 3

*FTC v. Dean Foods Co.*, 384 U.S. 597 (1966) ............................................................................ 45

*FTC v. Elders Grain, Inc.*, 868 F.2d 901 (7th Cir. 1989) ..................................................... 13, 14

*FTC v. Exxon Corp.*, 636 F.2d 1336 (D.C. Cir. 1980)............................................................ 14, 32

*FTC v. Food Town Stores, Inc.*, 539 F.2d 1339 (4th Cir. 1976)........................................... 14, 45

\* *FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) ........................................................ *passim*

*FTC v. PPG Indus., Inc.*, 798 F.2d 1500 (D.C. Cir. 1986) ......................................................... 16

\* *FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997) ...................................................... *passim*

\* *FTC v. Swedish Match*, 131 F. Supp. 2d 151 (D.D.C. 2000)............................................... *passim*

*FTC v. University Health, Inc.*, 938 F.2d 1206 (11th Cir. 1991)................................................. 45

*FTC v. Weyerhaeuser Co.*, 665 F.2d 1072 (D.C. Cir. 1981) ....................................................... 45

\* *FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ..................................... *passim*

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485 (2d Cir. 2004)............... 25, 30, 31

*Hosp. Corp. of Am.v. FTC*, 807 F.2d 1381 (7th Cir. 1986) ........................................................ 16

*In re Owens-Illinois*, 115 F.T.C. 179 (1992) ....................................................................... 32, 33

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210 (D.C. Cir. 1986) ........... 19, 30

*United States v. Baker Hughes Inc.*, 908 F.2d 981 (D.C. Cir. 1990).................................... 16, 41

*United States v. Continental Can Co.*, 378 U.S. 441 (1964) ................................................. 32, 33

\* *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) .............................. *passim*

*United States v. Visa USA, Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001)...................................... 42

**STATUTES**

FTC Act § 5, 15 U.S.C. § 45...............................................................................*passim*

FTC Act § 13(b), 15 U.S.C. § 53(b) ...................................................................*passim*

Clayton Act § 7, 15 U.S.C. § 18 .........................................................................*passim*

**OTHER AUTHORITIES**

Phillip E. Areeda, Herbert Hovenkamp *et al.*, *Antitrust Law* ........................................ 39

R. Posner & F. Easterbrook, *Antitrust Cases, Economic Notes and Other Materials* ................. 33

Joseph Farrell, *Fox, or Dangerous Hedgehog? Keyte and Schwartz on the 2010 Horizontal Merger Guidelines*, 77 ANTITRUST L.J. 661 (2011) ............................................................... 32

U.S. Dep't of Justice & Federal Trade Commission, 2010 Horizontal Merger Guidelines .. *passim*

**GLOSSARY**

For the Court's convenience, we have attached a name glossary identifying the individuals and companies whose testimony is cited herein.

The Federal Trade Commission ("FTC" or the "Commission") has commenced an action in this Court under Section of 13(b) of the FTC Act seeking to enjoin preliminarily Ardagh Group S.A. ("Ardagh") from completing its acquisition of Saint-Gobain Containers, Inc. ("Saint-Gobain" or "Verallia North America") until the resolution of the Commission's pending administrative case to determine the legality of the proposed acquisition.  The Commission respectfully submits this memorandum of law in support of its preliminary injunction motion.

## INTRODUCTION

The Commission seeks to halt an acquisition that, if consummated, would dramatically concentrate the glass container industry in the hands of two manufacturers and lead to higher prices for glass beer and spirits bottles.  For years, three manufacturers have dominated the $5 billion glass container industry in the United States.  The second- and third-largest of these manufacturers, Ardagh and Saint-Gobain, now propose to merge in a transaction that would create a durable duopoly.  Under well-settled precedent and the Commission's merger guidelines, this merger to duopoly is presumptively unlawful.  Indeed, a top Ardagh sales executive stated in June 2013 that Ardagh believes the transaction "may not get approved" since "it is going from 3 to 2 major suppliers."[1]

The Commission has initiated an administrative proceeding to adjudicate the legality of the proposed transaction under the antitrust laws, and the trial in that proceeding begins on December 2, 2013.  Thus, the only issue for this Court is whether to grant interim relief by enjoining the Defendants from consummating the proposed acquisition pending the upcoming merits trial.  The Court should do so because such interim relief is necessary to prevent consumer harm and to preserve the possibility of an effective remedy.

---

[1] PX 1574.

Under Section 13(b) of the FTC Act, the Commission is entitled to a preliminary injunction "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest."  15 U.S.C. § 53(b).  At this stage, the Commission is *not* required to prove whether the acquisition, is, in fact, illegal under the antitrust laws.  "That responsibility lies with the FTC" after a full administrative hearing.  *FTC v. Whole Foods Market*, *Inc*., 548 F.3d 1028, 1035 (D.C. Cir. 2008) (Brown, J.).  The FTC creates a strong "presumption in favor of preliminary injunctive relief" by raising "questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals."  *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 714-15 (D.C. Cir. 2001).  The Commission undoubtedly has met that standard here.

To counter this strong presumption, coupled with the strong "public interest in effective enforcement of the antitrust laws," defendants must show "particularly strong equities" that favor allowing the acquisition to close before trial.  *Id*. at 726-27; *Whole Foods*, 548 F.3d at 1035 (Brown, J.).  Defendants cannot do so.  At best, Defendants' arguments only underscore the "serious, substantial" questions to be resolved in the administrative trial.

This acquisition will likely cause anticompetitive effects in at least two relevant antitrust product markets:  the manufacture and sale of glass containers to (1) beer brewers ("Brewers") and (2) spirits distillers ("Distillers").  Both are relevant antitrust markets for the purposes of assessing the acquisition's competitive impact because other types of containers, such as aluminum cans or plastic bottles, are not economically viable substitutes for glass.

The proper delineation of the relevant market is ultimately "a matter of business reality – a matter of how the market is perceived by those who strive to profit in it."  *FTC v. Coca-Cola*

*Co.*, 641 F. Supp. 1128, 1132 (D.D.C. 1986), *vacated as moot*, 829 F.2d 191 (D.C. Cir. 1987).

On that question, the evidence leaves little doubt.

- Glass container manufacturers refer to the "three majors" of glass container manufacturing, tell the investment community they operate in a glass container market, and calculate market shares based only on glass container sales.

- Aluminum and plastic container manufacturers have testified that they do not compete directly with glass.

- Glass container manufacturers bid for contracts knowing their customers have already excluded aluminum cans or plastic bottles from consideration.

- Brewers and Distillers who sell products in glass bottles want glass – not cans or plastic – because their customers demand it.  As one Brewer explained when asked: "Who determines the mix of packaging?  Consumers."[2]

- Brewers and Distillers do not change their brands' packaging based on variations in the relative prices of glass, metal, or plastic containers.

Unless enjoined, Ardagh's planned $1.7 billion acquisition of Saint-Gobain would produce a single firm controlling ▮ percent of the U.S. glass container industry, according to Ardagh's own assessment.  The only other major U.S. manufacturer – Owens-Illinois, Inc. ("O-I") – controls roughly ▮ percent of the industry.  The post-acquisition duopolists would collectively control approximately ▮ percent of the glass container market for Brewers and ▮ percent for Distillers, easily exceeding the levels required to establish a presumption that the acquisition violates the antitrust laws.  The remaining competitors are fringe importers and small-scale or niche manufacturers.

Today, Ardagh, Saint-Gobain, and O-I – the "three majors," to borrow a term from Ardagh's documents – recognize their mutual incentives to avoid excess capacity that could lead to greater price competition.  Indeed, Ardagh's North American President described the glass container industry as having "evolved" to be "very disciplined with 'well-balanced' if not tight

---

[2] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

supply demand dynamics."[3] ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

Still, Brewers and Distillers today benefit from competition among the major glass manufacturers by encouraging those manufacturers to bid for their business, and those benefits accrue to consumers. The proposed acquisition would end that competition between Ardagh and Saint-Gobain and lead to higher prices for beer and spirits bottles. It would also dramatically increase the ease and likelihood of coordination between the only two remaining Majors in a "highly concentrated market, with stable market shares, low growth rates and significant barriers to entry" – a situation that provides "few incentives to engage in healthy competition." *FTC v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, 66 (D.D.C. 2009) (Collyer, J.).

The barriers to entry in this market are extraordinarily high. Glass plants cost hundreds of millions of dollars and take years to build. Not surprisingly, Defendants tout the fact that "new market entrants are faced with meaningful barriers to entry, including significant start-up costs (estimated at $200 million for a new plant)," and other barriers.[6] Where, as here, the market is ripe for coordination and new entry is improbable, "no court has ever approved a merger to duopoly." *Heinz*, 246 F.3d at 717.

---

[3] PX 1260-004; Fredlake Dep. at 126-27.

[4] ████████████████████████████████████

[5] ████████████████████████████████   *see also* Grewe Dep. at 128 ████████████████

████████████████████

[6] PX 1247-008.

## STATEMENT OF FACTS

Americans consume more than 18 billion beer and spirits products packaged in glass containers each year,[7] and the vast majority of these containers are manufactured by the Three Majors: Ardagh, Saint-Gobain, and O-I.[8] The Three Majors sell their glass bottles to America's alcoholic beverage companies, who, in turn, fill them with their products to meet the demands of the individual consumers who ultimately purchase and enjoy their products. Each of the Three Majors has a network of manufacturing plants in the United States: Ardagh has 9 plants, Saint-Gobain has 13, and O-I has 17. Given shipping costs, the Three Majors' geographically distributed networks of plants are a key competitive asset.[9]

There is a fringe of independent, single-plant glass container manufacturers in the United States, but these manufacturers account for only eight percent of glass container sales to Distillers and less than one percent of glass container sales to Brewers.[10] None of these independent manufacturers has more than one U.S. glass container plant.[11] Three beverage companies also each operate a single glass container manufacturing plant: E. & J. Gallo Winery (through Gallo Glass Company), Anheuser-Busch InBev ("ABI") (through Longhorn Glass Corporation), and MillerCoors (through Rocky Mountain Bottle Company – a joint venture with O-I). ███████████████████████████████████ ███ ████████████

████████████████████████████████████████████████████████████████████

---

[7] *See* PX 4067; PX 2040-019.

[8] PX 2000-031; PX 1264-017; *see also* PX 1433-002; PX 1054-011; PX 6012 (Rhea IH Tr. at 157-58). Saint-Gobain operates under the name "Verallia North America" or "VNA." The Commission will use the abbreviation "IH Tr." to refer to transcripts of sworn testimony provided in FTC investigational hearings.

[9] *See* PX 1233-045; ████████████████████████████████████████████

[10] PX 7003.

[11] ████████████████████████████████████████████████████████████████ *see also* PX 2000-068. Some fringe manufacturers have additional facilities where they make other, non-competitive categories of glass, like kitchenware or scientific glass. ████████████████████

[12] ████████████████████████

██████████████████████████ Two Mexican manufacturers, Vitro and Fevisa, currently export comparatively small volumes of beer and spirits bottles to the United States. Thus, the U.S. fringe, self-suppliers, and Mexican firms have a limited impact on competition for glass container sales to U.S. Brewers and Distillers.[14]

Beer bottles account for 58 percent of total glass containers usage in the United States.[15] Spirits bottles account for 4 percent.[16] All glass containers are made through the same basic manufacturing process, and the Three Majors also manufacture glass containers for other end-uses, such as wine, foods, and condiments.[17] The manufacturing process for other types of glass, such as flat window glass, table glass (e.g., drinking glasses and kitchenware), and specialty pharmaceutical or industrial glass is different.  Defendants do not compete with the manufacturers of these other types of glass in the United States.[18]

## I.    Glass Containers Have Unique Attributes.

Brewers and Distillers prize glass containers because the qualities of glass convey a desirable or distinctive product image.[19] Glass reflects light in a unique way, preserves flavor, and extends shelf life.[20] Glass has low gas permeability which helps to maintain the freshness of

---

[13] ██████████████████████████

[14] ████████████████████████████████████████

[15] PX 1378-029.

[16] PX 1378-029.

[17] PX 1378-029.

[18] PX 6007 (Wall IH Tr. at 18-19).

[19] PX 1378-029.

[20] PX 1378-006, 029; ██████████████████

beer or to preserve the quality of spirits likely to sit on a bar for a long time.[21]  Glass is also

regarded as chemically inert, made from non-toxic raw materials, and infinitely recyclable.[22]

 The unique qualities of glass containers make them attractive to bottlers seeking to build

or maintain a particular brand identity.[23]  Individual consumers, restaurants, and bars desire the

premium image glass connotes.[24]  Brewers and Distillers turn to glass containers to create iconic

brands, such as ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████[25]

 Other types of containers, such as aluminum cans or plastic bottles, lack the attributes

that make glass unique in the eyes of Brewers and Distillers.  Indeed, Ardagh has admitted in this

action that it believes that glass containers "will continue to maintain a leading presence in the

high-end beverage [] segment[] due primarily to consumer preferences and the premium

perception that glass offers, despite the broader impact of the substitution of plastic and other

alternative packaging materials."[26]  In addition to glass, some Brewers also use aluminum cans to

package beer, and some Distillers use plastic bottles to package spirits.[27]  But these other



[21] █████████████████████████████████████████████████████
██████████████████████████████████

[22] PX 1378-006, -029.

[23] █████████████████████████████████████████████████████████
███████████████████████████████████

[24] ███████████████████████████████████████████

[25] ██████

[26] Ardagh Response to Request for Admission 25.

[27] A small amount of beer is also packaged in plastic, ██████████████████
████████████████████████████████████  Moreover, according
to Ardagh's CEO, beer in plastic is revolting.  PX 6007 (Wall IH Tr. at 39).

materials have their own attributes that differ from those of glass containers, and Brewers and Distillers who purchase glass do not view plastic or metal containers as equivalent to glass.[28]

## II.     The Glass Container Industry Is Already Consolidated.

The Three Majors are the product of significant consolidation in the U.S. glass container industry.  Before 1983, there were 19 U.S. glass container manufacturers with multiple manufacturing plants.[29]  As a result of multiple mergers in the 1980s and 1990s, Three Majors came to dominate the industry:  O-I, Saint-Gobain, and Anchor Glass Container Corporation ("Anchor"), now owned by Ardagh.[30]

Ardagh Group, a European glass and metal company, has hastened further consolidation. Ardagh entered the U.S. glass container industry in 2012 by acquiring Leone Industries, a small, single-plant glass manufacturer.  Then, in July 2012, Ardagh acquired Anchor and its eight plants.[31]  Only six months later, in January 2013, Ardagh announced this proposed acquisition of Saint-Gobain, which would consolidate the Three Majors down to two.

Before 2006, the Three Majors sought to fill excess capacity by vigorously competing to gain volume and market share, leading to "price wars" – also colorfully termed ▮▮▮▮▮ or ▮▮▮▮▮▮▮  This price competition led to lower margins for the Three Majors and lower prices for customers.[33]  Profit and financial performance suffered.[34]

---

[28] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[29] PX 1067-019.

[30] PX 1067-019.

[31] Given Anchor's long history in the industry and Ardagh's recent purchase of the company, many people continue to refer to Ardagh Glass North America as "Anchor."  For convenience, the Commission will refer to Ardagh Glass North America simply as "Ardagh" unless it is relevant to distinguish the parent company from the North American glass unit.

[32] Grewe Dep. at 77; PX 2000-222; PX 1381-010; PX 2290-001.

[33] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8

The Three Majors have reversed that trend by pursuing a "price over volume" strategy (also referred to as "value over volume" or "margin before volume").[35]  All Three Majors recognized they would benefit from keeping capacity and demand in close balance and maintaining disciplined pricing policies that ensured higher profits.[36]  The Three Majors "rightsized" or "rationalized" capacity by closing plants and furnaces.[37]  They exercised disciplined pricing.  And they adopted contracts featuring "cost pass-through" or "price adjustment formula" terms that shift the risk of volatility in manufacturing costs – like energy, raw materials, and labor – to their customers.[38]

### III.    Ardagh And Saint-Gobain Compete With Each Other Today.

Despite the Three Majors' recognition of their aligned incentives, glass container customers today still benefit from competition.  For example, after an Anchor spirits customer obtained a lower price quote from O-I in August 2011, Anchor's CEO wrote that it ███████ ███████████████████████████   A July 2011 email from Anchor's Vice President of Sales aptly described current competitive constraints: ██████████████████████████████ ███████████████████████████████████████████████████

The Three Majors closely monitor each other's capacity, customer contracts, price increase timing, and other competitive activity.[41]  Most large Brewers and Distillers invite the Majors to submit competitive bids and buy directly from them under negotiated supply

---

[34] PX 1381-010; PX 2000-019, 219, 222; PX 6002 (Wieclaw IH Tr. at 259-60).

[35] PX 1381-010; PX 2000-222; PX 2227-002; PX 1381-010; PX 6004 (Fredlake IH Tr. at 111-13).

[36] PX 1260-004; PX 6012 (Rhea IH Tr. at 61-62).

[37] PX 1067-020.

[38] Grewe Dep. at 85-88; PX 6003 (Wilkes IH Tr. at 67); PX 1204-009; PX 2000-222; PX 1206-017.

[39] PX 1283-001.

[40] PX 1049-001.

[41] *See* PX 1021; PX 2366; PX 2000-030, 32, 300; PX 1046-001; PX 1126-001; PX 6012 (Rhea IH Tr. at 232-33).

agreements typically lasting three to five years.[42]  Thus, customers seek to encourage

competition between Ardagh and Saint-Gobain on a regular basis.  Defendants' documents and

customer testimony show how Ardagh and Saint-Gobain actively compete.[43]

      In myriad business documents, Ardagh and Saint-Gobain identify each other as key

competitors, and recent testimony confirms that competitive relationship.[44]  Anchor's 2012

███████████████████████ presentation to Ardagh identified only the Three Majors and attributed

market shares in an overall glass container market of ██ percent to Anchor, ██ percent to Saint-

Gobain, and ██ percent to O-I.[45]

      Head-to-head price competition between Ardagh and Saint-Gobain is common.



In 2012, █████████████████████

███████ used competitive pressure from Saint-Gobain to get lower pricing from Ardagh.[47]

Likewise, in its 2012 negotiation, the craft brewer ████████████ used competitive pressure

from Ardagh to negotiate a lower price and other benefits from Saint-Gobain.[48] ███████████

█████████████████████████████████████████████████████ solicited

---

[42] *See* PX 6001 (Love IH Tr. at 33-34); ████████████████████████████████████ PX 6003 (Wilkes IH Tr. at 210-11).

[43] ███████████████████████████████████████████████████████████████████ PX 1399-001; PX 1408-002;  PX 1415-002-003; PX 1417-015; PX 1406-001.

[44] *See, e.g.*, PX 2000-059-66; PX 2007-029-033; PX 1019-003; PX 1264-017; PX 6001 ████ IH Tr. at 40); PX 6013 ██████ IH Tr. at 232).

[45] PX 1264-017.

[46] *See, e.g.*, PX 1399; PX 1037; PX 1043; PX 2157; PX 1398; PX 2434-016; PX 1543; PX 1399-001; PX 1417-015; PX 1406; PX 2436-003; PX 2437-005.

[47] ██████████████████████████████

[48] ██████████████████████████████████████████████████

bids for glass bottles in 2012 from all Three Majors and believes that the bidding among them directly led to lower prices.[49]

Ardagh and Saint-Gobain also compete directly with one another to offer customers superior service, product quality, and innovation,[50] better supply reliability,[51] and better options on other non-price factors.[52] ████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████ ███████████████████████████

██████████████████████████████████████████████

██████████████████████

## IV. Anchor Alleged A Relevant Product Market Of Glass Containers Only, Excluding Plastic and Metal.

Defendants may try to convince this Court that they compete as closely with plastic and metal container manufacturers as with glass container manufacturers. But Anchor, Ardagh's predecessor in the U.S., told a starkly different story to another federal court when describing the relevant markets in which it competes. In 2001, Anchor sued O-I to prevent O-I from acquiring a controlling stake in Anchor, alleging that O-I's proposed acquisition would violate Section 7 of the Clayton Act – the same law at issue here. In its complaint, Anchor asserted that:

- "In the glass container industry, three companies account for well in excess of 90% of the United States market."

- The "relevant market is the market for the manufacture and sale of glass containers of various types, designs and sizes in the United States," and there are also "narrower

---

[49] ████████████████████████████████████████

[50] ████████████ PX 6010 (Shanteau IH Tr. at 77-78).

[51] ████████████████████████████

[52] ██████████████████████████████████████████████ *cf.* PX 6002 (Wieclaw IH Tr. at 162-67); ██████████

[53] ████████████████████

[54] ████████████████████████████████

11

relevant product markets" including the manufacture and sale of glass containers for certain beer and spirits products.

- The market is "highly concentrated" and is a "mature, low-growth" business.

- "[C]ustomers depend on competition among glass container manufacturers to keep prices down and to insure high standards of service and quality."

- "For a substantial percentage of purchasers of glass containers, substitution of other materials such as plastic would not be feasible in response to a small but significant non-transitory increase in the price of glass containers."[55]

Ultimately, the lawsuit settled, but Anchor's admissions provide critical insights into the economic realities of the marketplace.

## V.     The Commission Challenges Ardagh's Acquisition Of Saint-Gobain.

Ardagh and Compagnie de Saint-Gobain, Saint-Gobain's parent company, entered into a Share Purchase Agreement on January 17, 2013, pursuant to which Ardagh proposes to acquire Saint-Gobain for approximately $1.7 billion on or before January 13, 2014. On June 28, 2013, the Commission voted to file an administrative complaint challenging the acquisition and authorized Commission staff to seek a preliminary injunction enjoining the acquisition pending the resolution of the Commission's administrative trial.

## ARGUMENT

The question before this Court is whether it is in the public interest to order Defendants to refrain from closing their transaction until the FTC has concluded its ongoing administrative proceeding. Under controlling law, the answer is plainly yes.

## I.     THE FTC HAS RAISED "SERIOUS, SUBSTANTIAL" ISSUES APPROPRIATE FOR AN ADMINISTRATIVE TRIAL.

The Commission has determined that it has "reason to believe" that Ardagh's proposed acquisition of Saint-Gobain violates Section 7 of the Clayton Act and Section 5 of the FTC Act.

---

[55] PX 1379 ¶¶ 1, 10-13 (Complaint, *Anchor Glass Container Corp. v. Owens-Illinois, Inc.*, No. 8:01-cv-1849 (M.D. Fla. Sep. 26, 2001)).

In these circumstances, Section 13(b) of the FTC Act authorizes the Commission to seek a preliminary injunction halting the merger until the Commission "has had an opportunity to adjudicate the merger's legality in an administrative proceeding." *CCC Holdings,* 605 F. Supp. 2d at 35 (citing 15 U.S.C. § 53(b)).  The merits trial is scheduled to begin on December 2, 2013 before an administrative law judge, and discovery in that action is nearly complete.  Although the acquisition agreement permits Defendants to close in early 2014 (and could presumably be extended), Defendants have threatened to close their acquisition before the completion of the administrative trial.  Ardagh intends to litigate the merits trial to conclusion regardless of whether this Court grants the Commission injunctive relief.  Ardagh's counsel told the administrative law judge: "[i]f the injunction issues, the parties intend to continue on the administrative proceeding. We will continue to litigate. . . .That is not bluster, Your Honor."[56] Thus, the only issue for this Court is whether the Commission is entitled to a preliminary injunction to preserve its ability to obtain effective relief and to prevent consumer harm.

Section 13(b) of the FTC Act enables the Commission to seek to preserve the status quo in this precise situation.  The legislation authorizes the Court to issue a preliminary injunction "where such action would be in the public interest—as determined by a weighing of the equities and a consideration of the Commission's likelihood of success on the merits." *Heinz*, 246 F.3d at 714.  The Court must balance these two "public interest" considerations on a sliding scale. *See CCC Holdings*, 605 F. Supp. 2d at 35 (citing *Heinz*, 246 F.3d at 714); *Whole Foods*, 548 F.3d at 1035 (Brown, J.); *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 903 (7th Cir. 1989) (Posner, J.).  The greater the FTC's showing of likelihood of success on the merits, the heavier the

---

[56] PX 0005 (Initial Scheduling Conference Transcript) at 9.

defendants' burden to show "particularly strong equities" in their favor. *Whole Foods*, 548 F.3d at 1035 (Brown, J.); *Elders Grain*, 868 F.2d at 903.

In Section 13(b), Congress demonstrated its concern that "injunctive relief be broadly available to the FTC." *Heinz*, 246 F.3d at 714 (quoting *FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C. Cir. 1980)). Accordingly, Section 13(b) eases the more stringent injunction standard required of private parties. *Id.*; *see also Whole Foods*, 548 F.3d at 1042 (Tatel, J.) ("[T]he FTC – an expert agency acting on the public's behalf – should be able to obtain injunctive relief more readily than private parties."). Thus, at this stage, the FTC is *not* required to prove, nor is this Court required to find, that the proposed acquisition would violate the antitrust laws. *CCC Holdings*, 605 F. Supp. 2d at 35 (citing *Staples*, 970 F. Supp. at 1070). As the D.C. Circuit recognized in *Heinz*, "[t]hat adjudicatory function is vested in the FTC in the first instance." 246 F.3d at 714 (quoting *FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1342 (4th Cir. 1976)).

The Commission has met the standard for showing a likelihood of success on the merits because the evidence here raises "serious, substantial questions meriting further investigation." *Whole Foods*, 548 F.3d at 1049 (Tatel, J.); *id.* at 1035 (Brown, J.); *Heinz*, 246 F.3d at 714-15; *see also CCC Holdings*, 605 F. Supp. 2d at 36. Defendants' admissions alone raise serious questions of illegality surrounding this acquisition. Anchor alleged in its 2001 antitrust lawsuit that the "market for the manufacture and sale of glass containers in the United States is highly concentrated" and "the three largest producers . . . account for in excess of 90% of the domestic volume."[57] The glass container industry remains just as concentrated today as it was then.

The proposed acquisition would create a duopoly in markets with high entry barriers and conditions ripe for coordination – an outcome "no court has ever approved." *Heinz*, 246 F.3d at

---

[57] PX 1379 ¶ 13.

716-17; *see, e.g.*, *CCC Holdings*, 605 F. Supp. 2d 26 (preliminarily enjoining three-to-two merger of insurance software providers); *FTC v. Swedish Match*, 131 F. Supp. 2d 151 (D.D.C. 2000) (preliminarily enjoining merger of loose-leaf tobacco firms where "the top two firms left. . . will have ninety percent of the market."); *FTC v. Staples*, *Inc.*, 970 F. Supp. 1066 (D.D.C. 1997) (preliminarily enjoining three-to-two merger of office supply superstores); *United States v. H&R Block*, *Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) (permanently enjoining three-to-two merger of tax software firms).  There is no reason for this Court to be the first to bless such a merger.

Under the second prong of the Section 13(b) analysis, there is a general presumption in favor of the FTC in the weighing of the equities because "'the public interest in the effective enforcement of the antitrust laws' was Congress's specific 'public equity consideration' in enacting" Section 13(b).  *Whole Foods*, 548 F.3d at 1035 (Brown, J.) (quoting *Heinz*, 246 F.3d at 726).  No compelling public equities favor allowing this acquisition to close before the trial. Private equity considerations, such as a risk that a transaction will not occur, are given little weight.  *Whole Foods*, 548 F.3d at 1034-35 (Brown, J.); *CCC Holdings*, 605 F. Supp. 2d at 75-76.  Here, because Defendants confirmed that they will litigate through trial regardless of this Court's ruling, there is nothing to weigh.  Preserving the status quo will protect the public interest and will not harm Defendants, who can close their transaction if they succeed in the ongoing administrative proceeding.

## II.     THE PROPOSED TRANSACTION IS PRESUMPTIVELY UNLAWFUL.

Section 7 of the Clayton Act bars mergers or acquisitions "the effect of [which] may be substantially to lessen competition, or to tend to create a monopoly" in "any line of commerce or . . . activity affecting commerce in any section of the country."  15 U.S.C. § 18.  "Congress used the words 'may be substantially to lessen competition' to indicate its concern was with probabilities, not certainties."  *Heinz*, 246 F.3d at 713 (quoting *Brown Shoe Co. v. United States*,

370 U.S. 294, 323 (1962)).  Thus, an acquisition violates Section 7 if it "create[s] an appreciable

danger of [anticompetitive] consequences in the future.  A predictive judgment, necessarily

probabilistic and judgmental rather than demonstrable, is called for."  *Heinz*, 246 F.3d at 719

(quoting *Hosp. Corp. of Am.v. FTC*, 807 F.2d 1381, 1389 (7th Cir. 1986)).  An acquisition that

violates the Clayton Act will also violate Section 5 of the FTC Act.  *See FTC v. PPG Indus.*,

*Inc.*, 798 F.2d 1500, 1501 n.2 (D.C. Cir. 1986).

 Courts typically analyze the likely competitive effects of an acquisition by determining

"(1) the 'line of commerce' or product market in which to assess the transaction; (2) the 'section

of the country' or geographic market in which to assess the transaction; and (3) the transaction's

probable effect on competition in the product and geographic markets."  *Staples*, 970 F. Supp. at

1072.  Under this analysis, the Commission must first show "undue concentration in the market

for a particular product in a particular geographic area."  *CCC Holdings*, 605 F. Supp. 2d at 36

(quoting *United States v. Baker Hughes Inc*., 908 F.2d 981, 982 (D.C. Cir. 1990)).  That prima

facie showing establishes a presumption that the acquisition is unlawful.  *Id.* at 36.  The burden

of rebutting that presumption then shifts to Defendants, who must show "that the market-share

statistics [give] an inaccurate account of the [acquisition's] probable effects on competition in

the relevant market."  *Id.* at 36 (quoting *Heinz*, 246 F.3d at 715).  This Court need not resolve the

merits of Defendants' rebuttal case.  Rather, in this Section 13(b) action, the Court must issue the

preliminary injunction unless the rebuttal arguments are so compelling they extinguish all the

"serious, substantial" questions of legality raised by this acquisition.  *Id.* at 67.

###  A.  Two Relevant Product Markets Are The Manufacture And Sale Of Glass Containers To (1) Beer Brewers And (2) Spirits Distillers.

 Two relevant product markets in which to assess the effects of this acquisition are the

manufacture and sale of glass containers to (1) Brewers and (2) Distillers.  The Court should

enjoin the transaction if the FTC shows a likelihood of success in either relevant product market.
*See Heinz*, 246 F.3d at 713 ("The statutory test is whether the effect of the merger 'may be
substantially to lessen competition' 'in any line of commerce in any section of the country.'")
(quotation omitted).

"A 'relevant product market' is a term of art in antitrust analysis." *H&R Block*, 833 F.
Supp. 2d at 50.  The Supreme Court has explained that "[t]he outer boundaries of a product
market are determined by the reasonable interchangeability of use or the cross-elasticity of
demand between the product itself and substitutes for it." *Brown Shoe Co.*, 370 U.S. at 325.  In
other words, courts consider whether different "products can be used for the same purpose, and,
if so, whether and to what extent purchasers are willing to substitute one for the other." *H&R
Block*, 833 F. Supp. 2d at 51 (quoting *Staples*, 970 F. Supp. at 1074).

In defining an antitrust product market, courts consider "such practical indicia as industry
or public recognition of the [relevant market] as a separate economic entity, the product's
peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices,
sensitivity to price changes, and specialized vendors." *Whole Foods*, 548 F.3d at 1037-38
(Brown, J.) (quoting *Brown Shoe*, 370 U.S. at 325); *see also CCC Holdings*, 605 F. Supp. 2d at
38; *H&R Block*, 833 F. Supp. 2d at 51.

Courts also rely on the Federal Trade Commission and U.S. Department of Justice
Horizontal Merger Guidelines ("Merger Guidelines").[58]  *See H&R Block*, 833 F. Supp. 2d at 52
(citing *Staples*, 970 F. Supp. at 1081-82); *CCC Holdings*, 605 F. Supp. 2d at 38 n.12; *Heinz*, 246
F.3d at 716 n.9, 718.  The Guidelines define a relevant market economically by asking whether a
monopolist of a particular group of substitute products could profitably impose a "small but

_____

[58] The U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines (2010) are attached
as PX 0004 and available online at http://www.ftc.gov/os/2010/08/100819hmg.pdf.

significant non-transitory increase in price" ("SSNIP") over those products, or whether customers switching to alternative products would make such a price increase unprofitable. *Merger Guidelines* § 4.1.1; *see also CCC Holdings*, 605 F. Supp. 2d at 38 n.12.  A five percent price increase is often appropriate in applying this "hypothetical monopolist" test.  *Merger Guidelines* § 4.1.2.  Further, if a hypothetical monopolist of a set of products (e.g., glass containers) can target a particular subset of customers (e.g., Brewers) for a small but significant non-transitory increase in price, it is appropriate to "identify relevant markets defined around those targeted customers."  *Merger Guidelines*, § 4.1.4.  Indeed, the Guidelines use glass container producers to illustrate this very principle with the following hypothetical example:

> Glass containers have many uses. In response to a price increase for glass containers, some users would substitute substantially to plastic or metal containers, but baby food manufacturers would not. If a hypothetical monopolist could price separately and limit arbitrage, baby food manufacturers would be vulnerable to a targeted increase in the price of glass containers. The Agencies could define a distinct market for glass containers used to package baby food.

*Merger Guidelines* § 4.1.4.

Market conditions today show that Brewers and Distillers are vulnerable to a targeted price increase.[59]  Faced with a five percent price increase, enough Brewers and Distillers would pay the higher price to make the price increase profitable for a hypothetical monopolist.[60]  As one brewer who sells beer in both glass bottles and cans testified: "As a practical matter, absent

---

[59] Glass container manufacturers set prices separately for different customers and can limit arbitrage.  They know their customers' relative willingness to pay for glass containers and charge different prices to different classes of customers (e.g., Brewers, Distillers, non-alcoholic beverage producers, etc.).  Manufacturers typically negotiate contracts on an individual basis, resulting in different prices even for customers within the same category.  Arbitrage among glass buyers is unlikely, and there is no evidence of it occuring today. ███████

[60] ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

a dramatic increase in the price of glass relative to aluminum, we are likely to produce and sell the vast majority of our products in glass for a very long time."[61]

Indeed, even large Brewers and Distillers cannot shift their glass purchases to make a price increase unprofitable.



### 1. Defendants' and Third Parties' Documents And Actions Show That The Relevant Product Markets Include Only Glass Containers.

Determination of the relevant market "is a matter of business reality—a matter of how the market is perceived by those who strive for profit in it." *Staples*, 970 F. Supp. at 1079 (quotation omitted). "When determining the relevant product market, courts often pay close attention to the defendants' ordinary course of business documents." *H&R Block*, 833 F. Supp. 2d at 52. In document after document, Defendants' own words and actions reveal that competitive conditions in the glass container industry drive their pricing and business strategy. *See Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 n.4 (D.C. Cir. 1986) ("[I]ndustry . . . recognition of the [relevant market] as a separate economic unit matters because we assume that



economic actors usually have accurate perceptions of economic realities.") (quotation omitted); *see also Whole Foods*, 548 F.3d at 1045 (Tatel, J.).

Defendants refer to themselves and O-I as the "three majors" and routinely calculate their market shares based only on glass container shipments.[65]  *See H&R Block*, 833 F. Supp. 2d at 53 (references to the "Big Three" competitors and market shares in documents supported relevant market finding); *Staples*, 970 F. Supp. at 1079 (references to the "Big Three").  Ardagh boasts that its "North American Glass Expansion" will make it the "#1 Player [with] 49% Market Share."[66]  Likewise, in marketing itself for acquisition last year, Anchor identified its "Competitive Landscape" as including only Anchor, Saint-Gobain, and O-I, and attributed 93 percent of an overall glass container market to those three firms.[67]  Other investor presentations depict the market in similar terms.[68]  Markets described in investor presentations are "strong evidence" of the relevant product market.  *H&R Block*, 833 F. Supp. 2d at 52-53.

Defendants' day-to-day business documents identify a glass-only market as well.  *See Staples*, 970 F. Supp at 1079-80 (relying on business documents in relevant market analysis).



---

[65] PX 1264-017; PX 2000-292, -340; PX 1433-002; PX 1054-011; *see also* PX 6012 (Rhea IH Tr. at 157-58).
[66] PX 1360-012; *see also* PX 1199-018.
[67] PX 1264-017.
[68] PX 1279-014, 018, 019; PX 1378.
[69] PX 1021; PX 1418; PX 6001 (Love IH Tr. at 33).
[70] PX 6001 (Love IH Tr. at 65-70).

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████

Anchor's admissions in its 2001 antitrust lawsuit confirm that the product markets include glass containers only. While Ardagh may find it convenient to disown these admissions, Anchor excluded plastic and metal containers from its relevant product markets based on facts that remain true today: "[C]ustomers depend on competition among glass container manufacturers to keep prices down," and "[f]or a substantial percentage of purchasers of glass containers, substitution of other materials such as plastic would not be feasible" in response to a SSNIP in the price of glass containers.[73] Ardagh itself has also acknowledged glass containers as a relevant antitrust market in the past. In its 2010 acquisition of a Dutch metal can company, Ardagh argued to European antitrust regulators that "the glass container market is a distinct product market from the market for other forms of rigid packaging in general," in part because customers seek bids for glass and other materials independently.[74] Ardagh recognizes the business realities of that important distinction. Its own glass and metal businesses are organized separately with separate sales forces and management teams.[75]

---

[71] *See* PX 2000-049-102.

[72] *See* PX 2000-048-058 (O-I), -059-066 (Anchor); *cf.* Grewe Dep. at 94-98.

[73] PX 1379 ¶ 12.

[74] PX 7002 ¶ 10. In 2005, Ardagh purchased the second-largest glass container supplier in the United Kingdom and argued in an antitrust review before the U.K. Office of Fair Trading that the relevant market was the "production of glass containers." PX 7001-015, -042.

[75] PX 6007 (Wall IH Tr. at 23-25).



Independent analysts also recognize the importance of competition among glass manufacturers.  In May 2013, Jefferies investment bank released a report stating that Ardagh's proposed acquisition of Saint-Gobain "would create an oligopoly where O-I and Ardagh would have a combined 92% market share" thus "setting the [North American glass container] industry up for a nice up cycle in price."[81]  When rating Anchor in 2010, Moody's noted there are "only three major competitors" in the "consolidated" glass packaging industry in North America.[82]

In sum, Ardagh, Saint-Gobain, ███ investors, and public analysts all consider competition among glass container firms to be economically meaningful and distinct from competition with manufacturers of other types of packaging.

---



[76] ████████████████

[77] ████████████████

[78] █████████████████████████

[79] ███████████████████████

[80] ████████████████

[81] PX 3024-001.

[82] PX 1201-002.  Likewise, in a 2011 report on the "North American glass industry," JP Morgan noted that the Three Majors comprise 90 percent of the market.  PX 2291-004; *see also* PX 1214-017.

### 2.   Plastic Bottles And Metal Cans Are Not In The Relevant Product Markets.

Defendants may argue that Brewers and Distillers can defeat a price increase by switching to plastic and metal containers.  The facts show otherwise.  The threat of Brewers and Distillers switching to cans and plastic bottles would not constrain a glass container monopolist from raising prices "at the . . . practical price increase levels that trigger antitrust concern—the typical five to ten percent price increase of the SSNIP test."  *H&R Block*, 833 F. Supp. 2d at 57. Cans and plastic are generally cheaper than glass containers, and many Brewers and Distillers already package some of their products in aluminum cans and plastic bottles.  As Anchor's CFO explained to a lender in 2012, "[i]f the key consideration is cost, bottlers will [choose] cans or plastic."[83]  As discussed further below, Brewers and Distillers choose to buy glass containers not based on the relative prices of different packaging materials, but because their customers demand their products in glass.

### i.   Glass Bottles Are Not In Price Competition With Plastic Or Metal Containers.

When compared to plastic and metal containers, glass containers have "peculiar characteristics,"[84] "unique production facilities,"[85] and, most importantly, "distinct prices." *Whole Foods*, 548 F.3d at 1037-38 (Brown, J.) (citing *Brown Shoe* practical indicia).  Ample evidence demonstrates that competition among the Three Majors constrains glass container prices today.[86]  Defendants have admitted that from 2003 to 2013, over ███ percent of the revenue from their most significant lost sales to Brewers and Distillers went to another supplier of glass

---

[83] PX 1085-003.

[84] *See* PX 1428-001-010; PX 1378-029.

[85] PX 6001 (Love IH Tr. at 70).

[86] ███████████████████████████████████████████

containers, as opposed to a supplier of another type of packaging.[87]  Direct price competition between glass container suppliers and plastic or metal container suppliers rarely occurs,[88] does not meaningfully constrain Defendants,[89] and is scarcely even plausible because glass containers in general are significantly more expensive than plastic or metal containers of equivalent size and volume.[90] ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████        Brewers and Distillers have testified that threatening to shift their packaging away from glass to other materials would be "an idle threat" and that the Three Majors would not "take such a threat seriously" in price negotiations.[93]

---

[87] For beer or spirits accounts or customers where Ardagh or Saint-Gobain lost more than 30 percent of the annual glass container sales revenue to another supplier of glass containers or due to substitution of a product other than glass containers, over ██ percent of the revenue from those lost sales was to another supplier of glass containers. *See* Ardagh Response to Requests for Admission Nos. 6 and 7; Saint-Gobain Response to Requests for Admission Nos. 7 and 8.

[88] *See, e.g.*, PX 6004 (Fredlake IH Tr. at 258); PX 6001 (Love IH Tr. at 212-14); PX 6002 (Wieclaw IH Tr. at 101-102); Grewe Dep. at 107; Love Dep. at 35-36.

[89] ████████████████████████████████████████████████████████████████████████████████████ *cf.* PX 6004 (Fredlake IH Tr. at 258); PX 6001 (Love IH Tr. at 212-14).

[90] PX 1085; PX 2142-006,- 008; PX 6001 (Love IH Tr. at 120); ████████████████████████████████████████████████████████████████ Aluminum bottles, which cost twice as much as similarly sized glass bottles are the exception, but also do not constrain glass prices.

[91] Grewe Dep. at 13 (plastic), 32 (cans); Fredlake Dep. at 18-20 (plastic), 28-29 (cans).

[92] ████████████████████████████████████████

[93] ████████████████████████████████████████████████████████████████████████████████████████

When purchasing glass containers, Brewers and Distillers request bids from the Three Majors and use competitive bidding to get better prices.[94]  These bid requests – known as requests for pricing or requests for quotation – specify glass containers only.[95]  Thus, the Majors know they are bidding against other glass suppliers – not plastic or metal firms.[96]  Moreover, customers who convert a product from glass to another material generally do not offer the Three Majors a chance to compete against the new material to keep the product in glass; customers usually present their decision as ███████████ in the words of Ardagh's North American President.[97]  And, once customers convert to another material, they do not return to glass.[98]

ii.   **Glass, Metal, And Plastic Containers Are Not Close Competitors.**

There is no evidence that glass container sales to Brewers or Distillers respond to price changes in plastic or metal containers – or vice versa.  For example, the price of glass containers relative to aluminum cans increased approximately 80 percent between 1981 and 2011, while the proportion of beer sold in glass bottles has remained stable.[99]  These price differentials confirm that glass containers are not in the same product market as plastic or metal.  *See H&R Block*, 833 F. Supp. 2d at 55 ("[T]he absence of close price competition" distinguishes relevant market); *Swedish Match*, 131 F. Supp. 2d at 165 ("Distinct pricing is also a consideration" in relevant market analysis); *see also Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496-97 (2d Cir. 2004).  Other economic evidence, including a critical loss analysis performed by the

---

[94] ███████████████████████████████████████████████
███████████████████████████████████████████████████████████

[95] *See, e.g.*, Love Dep. at 35-36; ████████████████████████ PX 1491-006; PX 1533-002; ████

[96] PX 6002 (Wieclaw IH Tr. at 101-102); Love Dep. at 35-36; *cf.* PX 6004 (Fredlake IH Tr. at 258); PX 6001 (Love IH Tr. at 212-14); Grewe Dep. at 107.

[97] PX 6004 (Fredlake IH Tr. at 258); *see also* Grewe Dep. at 107.

[98] *See* PX 6007 (Wall IH Tr. at 270); *see also* PX (Rhea IH Tr. at 173).

[99] PX 0006 (Expert Report of Dr. Frederick Warren-Boulton) ¶ 51.

Commission's expert economist, also confirms that glass containers sold to Brewers and Distillers are relevant product markets.[100]

Testimony from major plastic and metal container companies also indicates that these companies' containers are not in the same relevant product markets as glass.  Plastic and metal firms do not view glass manufacturers as direct competitors,[101] and do not bid against glass manufacturers for business.[102]  The plastic and metal companies underscore what Ardagh tells its own investors:  that glass containers compete only "indirectly" with these other materials.[103]

### iii.    There Is Economic Demand For Beer And Spirits In Glass.

To be sure, as a technological matter, beer and spirits can be packaged in both glass and other packaging materials, and Brewers and Distillers at times offer their brands in multiple package types or convert a product from glass to other packaging.  But the fact that some beers are sold both in cans and in glass, or that Distillers may sell some products in plastic and others in glass, simply cannot tell us "whether and to what extent purchasers [i.e., Brewers and Distillers] are willing to substitute one for the other."  *H&R Block*, 833 F. Supp. 2d at 51 (quoting *Staples*, 970 F. Supp. at 1074).

Brewers and Distillers select different packaging materials based on myriad commercial constraints such as consumer preferences, marketing considerations, and the demands of

---

[100] PX 0006 (Expert Report of Dr. Frederick Warren-Boulton) at Section VIII.

[101] ████████████████████████████████████████████████████████

[102] ████████████████████████████████████████████████████████████████

[103] PX 1393-071; PX 1342-015.  Even if plastic or aluminum companies at times try to entice Brewers and Distillers to bottle more products in plastic or aluminum, that hardly means that those materials should be included in the same relevant market as glass containers.  *See H&R Block*, 833 F. Supp. 2d at 54-55 (tax software not in same relevant market as tax stores despite attempts to convert tax store customers); *Whole Foods*, 548 F.3d at 1048 (Tatel, J.) ("[S]ufficiently innovative retailers can constitute a distinct product market even when they take customers from existing retailers.").

wholesale distributors and retailers.[104]  They analyze their customers and the situations in which

their products are consumed and try to match packaging to the customer and the occasion.  Many

consumers simply prefer beer in glass versus a can, while others' preferences may depend on

whether the setting is a picnic, a tailgate party, a fancy dinner, or a night club.[105] *Cf. H&R Block*,

833 F. Supp. 2d at 56 (the fact that switching between tax software and tax stores was driven by

changes in customers' personal status supported treating tax software as a distinct product

market).



███████████████████████████████████ The company expects cans to add extra

sales volumes, not to displace glass bottle sales – an expectation well supported by the

experience of other Brewers who previously introduced cans in addition to glass bottles.[110]

████████ would not switch its glass-bottled products "to cans or other containers even if the

cost of glass bottles were to go up by 5 to 10 percent" because "cans are not a suitable

replacement" for glass and "[o]ffering beer in a glass bottle is [their] primary business."[111]

Those Brewers who offer their beer in both glass and cans do not choose one form of

packaging over the other.  Rather, they fill orders from distributors who in turn receive orders

from retailers who decide what to stock on store shelves or behind the bar based on consumer

demand.  As one craft brewer testified:  "Q:  Who at the company, if anyone, decides what the

mix of bottled beer versus canned beer is in any given period or year?  A:  The company doesn't

decide.  The consumer decides."[112]

It would thus be wrong to conclude that cans are a ready substitute for glass because

████████ is sold in both cans and glass bottles.  Rather, the evidence (and common sense)

dictates a very different conclusion:  Bottled beer and canned beer both exist because there is

demand for both.  ████████████████████████████████████████████████████

██████████████████████████████████████   ████████████   which

offers its beer in glass bottles and cans, had an even simpler explanation of what would happen if



it could not sell its beer in glass: "It would end our business."[114]  Distillers also must respond to demand for specific packaging.  For example, after distiller ███████ attempted to convert a whiskey that "was a fairly large brand" in a "particular area of the country" from glass bottles to plastic, the product experienced a "substantial fall off in business."[115]

Testimony from many Brewers and Distillers confirms that commercial constraints would prevent them from simply substituting metal or plastic containers for glass when bottling their products, even if glass container prices rose five to ten percent.[116]  Moreover, because glass containers represent a small fraction of the retail price of beer and spirits, there are strong incentives for Brewers and Distillers to pay a price increase in glass bottles rather than to switch to aluminum cans or plastic bottles and risk driving consumers to competitors' products packaged in glass.[117]

The facts also show that there will continue to be significant demand for glass bottles for beer and spirits.  For example, the proportion of beer packaged in glass bottles versus aluminum cans today is almost exactly the same as it was thirty years ago, although demand trends for each package type have ebbed and flowed over the years.[118] ███████ ███████ ███████████ ████████████████████████████████████████ and the future of the U.S. glass container industry is bright enough for Ardagh to spend billions in two years trying to control roughly half

---

[114] ████████████████████ ("It would end our business. I don't know that it would end our business, but it would -- bottles are currently 75 percent of our business.").

[115] █

[116] ████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████

[117] PX 0006 (Expert Report of Dr. Frederick Warren-Boulton) at Section VI.B; █████████████

[118] PX 4067 (Beer Institute Brewers' Almanac 2012, "Package Mix Chart").

[119] PX 1361-0031-32; █████████████████████████

the industry's capacity.  Moreover, glass container prices and margins have risen in recent years, and Defendants have improved their financial performance.[120]

Brewers and Distillers who sell products in glass are not making irrational decisions by choosing glass containers, even though they are more expensive than cans or plastic.  They carefully study their consumers and choose packaging to maximize sales and profits, relying on competition among glass suppliers to get the best prices.  Because the Three Majors recognize this commercial reality, the elimination of competition due to the proposed acquisition would likely lead to higher prices.

### 3.  Case Law Supports The Commission's Definition Of The Relevant Product Markets.

#### i.  Cross-Elasticity, Not Functional Interchangeability, Is The Appropriate Test For Market Definition In This Case.

The mere fact that glass, plastic, and metal containers might all be *functionally* interchangeable for bottling beer and spirits does not show that they are in the same relevant product market.  As courts in this Circuit have emphasized, "[f]inding two products to be functionally interchangeable . . . does not end the analysis."  *Swedish Match*, 131 F. Supp. 2d at 158; *see also Staples,* 970 F. Supp. at 1074.  Courts often exclude functionally interchangeable products from a relevant product market.  *See Swedish Match*, 131 F. Supp. 2d at 158, 165; *Staples*, 970 F. Supp. at 1074, 1080; *Geneva Pharms.*, 386 F.3d at 496-99.  Indeed, the D.C. Circuit has long recognized that functional interchangeability is not typically one of the most significant criteria in market definition.[121]

---

[120] *See* Grewe Dep. at 149-51, 70-72, 77-79; Fredlake Dep. at 103, 111-12, 126; PX 2025-002; PX 1245-003; PX 2000-51; PX 2069-009; PX 1068-021, -034; PX 2063-007.

[121] Factors such as the "physical and functional relationship" between products "may be helpful where the other indicia are ambiguous," but "bear less directly upon the economic definition of a market" than the core "economic criteria that make one market distinct from another," such as "'distinct prices' and 'sensitivity to price changes,'" which directly "relate[] to the ability of the consumer to obtain substitutes for a product."  *Rothery Storage & Van Co.*, 792 F.2d at 218 n.4 (quoting *Brown Shoe*, 370 U.S. at 325).

Cross-elasticity of demand, the responsiveness of the sales of one product to price changes of another, is a much more important factor. Price differentials or variant pricing trends often show that functionally interchangeable – even identical – products must be treated as separate relevant antitrust markets. In *FTC v. Staples*, the court found that "office superstore prices are affected primarily by other office superstores and not by non-superstore competitors" selling *identical* products, thus excluding non-superstore competitors from the relevant market. 970 F. Supp. at 1077. In *Geneva Pharmaceuticals*, the Second Circuit held that a lack of price responsiveness between generic and branded versions of a chemically equivalent pharmaceutical compound evidenced separate product markets. 386 F.3d at 496-97. And, in *H&R Block*, the "lack of evidence of price competition" between tax software and other tax preparation services supported the conclusion that tax software and other tax services were not "reasonably interchangeable" and could not be "viewed as part of the same relevant product market." 833 F. Supp. 2d at 54-55.

The Commission is not arguing that plastic and metal containers do not compete with glass in an absolute sense, nor need the Commission do so. *See Staples*, 970 F. Supp. at 1075 (products inside and outside the relevant market "at some level, compete with one another"); *see also H&R Block*, 833 F. Supp. 2d at 54. As Ardagh told its investors in a 2012 bond offering, glass containers compete "indirectly" with other forms of packaging.[122] But "'the mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes.'" *H&R Block*, 833 F. Supp. 2d at 51 (quoting *Staples*, 970 F. Supp. at 1075). A relevant market "need not encompass the full range of substitutes. Including *all* substitutes would lead to absurdly broad markets that would,

---

[122] PX 1393-071; PX 1342-015.

as the Guidelines explain, make market shares misleading."[123]  Plastic and metal containers are

more indirect, distant competitors that will not constrain glass container pricing "at the . . .

practical price increase levels that trigger antitrust concern." *H&R Block*, 833 F. Supp. 2d at 57.

### ii. The Facts Here Dictate Relevant Markets Of Glass Containers For Brewers And Distillers.

In the ongoing FTC administrative proceeding, Defendants have argued that historical

cases require including plastic and metal in any relevant product market here.[124]  These

arguments are wrong.  "The proper market definition in this case can be determined only after a

factual inquiry into the commercial realities faced by consumers." *Eastman Kodak Co. v. Image*

*Technical Servs. Inc.*, 504 U.S. 451, 482 (1992) (quotation omitted).  "[M]arket definition is a

deeply fact-intensive inquiry."  *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001)

(Sotomayor, J.).  Thus, the fact-driven outcomes of cases involving glass containers from

decades ago – such as *United States v. Continental Can Co.*, 378 U.S. 441 (1964) and *In re*

*Owens-Illinois, Inc.*, 115 F.T.C. 179 (1992) – are irrelevant and cannot control the outcome here.

Nearly fifty years ago, in *Continental Can*, the government challenged a merger between

a glass container manufacturer and a metal can manufacturer.  In that case, where any

competition between the merging parties necessarily existed only at a broad level that included

both glass and metal packaging, the Supreme Court found that the relevant market for assessing

that particular acquisition included both glass containers and metal cans.  378 U.S. at 457.  In

more recent decades, antitrust experts, including Judge Posner and Judge Easterbrook, have

harshly criticized *Continental Can*, and the case is largely inapposite here.  In any event, as

Posner and Easterbrook have explained, and as is evident from the ruling, if the merger in

---

[123] Joseph Farrell, *Fox, or Dangerous Hedgehog? Keyte and Schwartz on the 2010 Horizontal Merger Guidelines*, 77 ANTITRUST L.J. 661, 663 (2011) (emphasis in original).

[124] *See* Introductory Statement, Answer and Defenses of Respondent Ardagh Group S.A., Docket No. 9356, Jul. 22, 2013 (F.T.C. 2013).

*Continental Can* "had been between two manufacturers of cans (or of [glass] bottles), the Court surely would have held that cans (or [glass] bottles) were an appropriate [relevant product market] in which to appraise the effects of the merger."  Richard Posner & Frank Easterbrook, ANTITRUST CASES, ECONOMIC NOTES AND OTHER MATERIALS at 366-67 (2d ed. 1981) (quoted in *Owens-Illinois*, 115 F.T.C. at 303); *see also Continental Can*, 378 U.S. at 457-58.  Thus, *Continental Can* cannot support including metal or plastic in the product market relevant to evaluating this merger – a merger of two glass makers.

The Commission's ruling on a prior glass container merger two decades ago also cannot dictate the outcome of this case, as the Commission – well aware of its prior decision – recognized in voting to bring this action.  O-I's acquisition of Brockway Glass in 1988 reduced the number of major U.S. glass container producers from six to five.  *See Owens-Illinois*, 115 F.T.C. at 189.  The district court denied the Commission's motion for a preliminary injunction. *Id.* at 291.  The administrative law judge found the merger anticompetitive after the merits trial, but the Commission ultimately found competitive responses from the many remaining post-merger glass container suppliers would make anticompetitive effects unlikely.  *Id.* at 323-26. That case involved starkly different facts and market concentrations.  Moreover, more recent legal authorities, including many of the cases from this Circuit cited above, have clarified the standards for defining relevant product markets.  These authorities provide the lodestar for this Court to follow in assessing the unique facts of this case.

### B.  The Relevant Geographic Market Is The United States.

The relevant geographic market for analyzing the proposed acquisition is the United States.  Defendants have geographically distributed networks of manufacturing plants that enable

them to compete on a nationwide basis.[125]  Defendants bid for and capture business throughout

the country, often shipping to customers hundreds of miles away from their plants.[126]  Thus, the

United States is the "geographic area in which the defendants compete in marketing their

products or services." *CCC Holdings*, 605 F. Supp. 2d at 37.

A geographic market larger or smaller than the United States would not accurately

capture the competitive reality.  Indeed, Ardagh admits that the relevant geographic market is no

larger than the United States.[127]  Smaller geographic markets would also be inappropriate.

Defendants routinely analyze competition and calculate market shares for the United States as a

whole.[128]  Although shipping costs can be significant, they are not determinative, and Defendants

compete with each other and other glass container manufacturers across the country.  For

example, during 2011 negotiations, ███████████████████████ obtained a lower

price quote on glass beer bottles from O-I's ████████ due to competition from Anchor and

Saint-Gobain, even though Anchor and Saint-Gobain would have supplied █████ from plants

that were ██████████████████████ significantly farther than O-I's

plant.[129] █████████████████████████████████████

████████████████████████████████████████

████████████████████ Given such nationwide competitive dynamics, the United

States is the relevant geographic market for analyzing the effects of the acquisition.

---

[125] PX 2000-040.

[126] PX 1021; PX 2366; PX 4525-004-005.

[127] Answer and Defenses of Defendant Ardagh Group S.A., ECF No. 39, ¶ 38.

[128] PX 1264-022; PX 2078-012, -013; PX 1033-009; PX 1021; PX 1535; PX 2000-292; PX 2366.

[129] ████████████████████████████████████

[130] ████████████████████████████████████

### C.  The Transaction Is Likely To Lead To Reduced Competition And Higher Prices.

Defendants' proposed acquisition presumptively violates the Clayton Act and the FTC Act because it would radically increase concentration in relevant markets that are already concentrated.  Beyond this presumption of illegality, courts typically consider whether an acquisition will cause anticompetitive effects under either of two rubrics:  coordinated effects and unilateral effects.  *See H&R Block*, 833 F. Supp. 2d at 76-77.  Coordinated effects occur when an acquisition enhances market power "by increasing the risk of coordinated, accommodating, or interdependent behavior among rivals," while unilateral effects occur when an acquisition enhances market power "simply by eliminating competition between the merging parties."  *Merger Guidelines* § 1.  This acquisition will likely cause competitive harm under both frameworks, as explained below and in the accompanying report of the Commission's expert economist.  The result will be significantly reduced competition and higher prices.

### 1.  The Acquisition Is Presumptively Unlawful Because It Will Substantially Increase Concentration.

An acquisition presumptively violates the Clayton Act and FTC Act where it would result in a firm controlling "an undue percentage share of the relevant market."  *Heinz*, 246 F.3d at 715. Market concentration is ordinarily measured by the Herfindahl-Hirschman Index ("HHI"), which is the sum of the squares of all competitors' market shares.[131]  "Sufficiently large HHI figures establish the FTC's prima facie case that a merger is anti-competitive."  *Heinz*, 246 F.3d at 716.

---

[131] In other words, in a market with four competitors, each of whom has 25% market share, the HHI would be 2500 $(25^2 + 25^2 + 25^2 + 25^2)$.

This acquisition would result in the following market concentrations:[132]

| Relevant Market | Pre-Acquisition HHI | Post-Acquisition HHI | Increase |
|---|---|---|---|
| Glass containers for beer | 2,874 | 3,657 | 782 |
| Glass containers for spirits | 2,067 | 3,138 | 1,072 |

Under the Merger Guidelines, markets with a post-merger HHI above 2,500 are "highly concentrated," and mergers "resulting in highly concentrated markets that involve an increase in the HHI of more than 200 points will be presumed to be likely to enhance market power." *Merger Guidelines* § 5.3.  The HHI increases here – nearly four and over five times the presumptive limit – result in post-acquisition HHIs that far exceed the threshold for "highly concentrated" markets, triggering the presumption of anticompetitive effects in both relevant product markets.[133]  *See Heinz*, 246 F.3d at 716-17 (citing Merger Guidelines for thresholds that trigger the presumption of anticompetitive effects).  Indeed, these increases are larger than those courts in this Circuit have found presumptively unlawful in other cases.  *See Heinz*, 246 F. 3d at 716 (increase of 510 over pre-merger HHI); *H&R Block*, 833 F. Supp. 2d at 72 (increase of 400 over pre-merger HHI).

## 2. The Acquisition Will Likely Result In Coordinated Anticompetitive Effects.

This acquisition would leave a glass container duopoly in the United States consisting of Ardagh and O-I.  "Merger law rests upon the theory that, where rivals are few, firms will be able to coordinate their behavior, either by overt collusion or implicit understanding, in order to . . . achieve profits above competitive levels."  *Heinz*, 246 F.3d at 715 (quotation omitted).

---

[132] PX 7003.  PX 7003 provides the market shares and HHI calculations for the relevant markets.

[133] The HHI values above are calculated from 2012 market shares based on revenue and are conservative compared with some of Defendants' own estimates, which allot them even higher market shares.  The HHIs presented here differ slightly, but not materially, from those presented in the Complaint based on further analysis of import figures.

Coordination among duopolists may occur in many ways.  For example, not only will the ability to coordinate pricing increase in a duopoly, but the ability to allocate customers or coordinate output will increase as well.  *Cf. Merger Guidelines* § 7.2.

The relevant markets are ripe for coordination.  Indeed, many factors this Court identified as conducive to coordination in *CCC Holdings* are present here.  The highly concentrated glass container industry has stable market shares, low growth rates, and significant barriers to entry.[134] As this Court explained in *CCC Holdings,* these very conditions leave "few incentives to engage in healthy competition."  605 F. Supp. 2d at 66.  ███████████████████████████

███████████████████████████████████████████████

████████████████     ███████████████████████████

███████████████████████████████████████████████

████████████████████████████      *Id.* at 65.  As in *CCC Holdings*, the Three Majors have "sought to gather as much competitive information [about each other] as possible for a number of years, and have largely succeeded in their efforts."  *Id.* (internal quotation and citation omitted).  Defendants obtain rich information about their glass competitors via several channels, including public statements, industry analysts, distributors, and customers.[137]  And these are certainly markets "in which the same three companies have been competing against each other for over a decade, making the market participants very familiar with each other."  *Id.* at 64-65.

---

[134] *See, e.g.*, PX 1260-001, -004; PX 1247-008; PX 1336-057.

[135] *See, e.g.*, PX 1068-025; PX 1021; PX 2366; PX 1047 (attachment); PX 1286; PX 2000 -300-01; PX 1068-036; PX 2019-036-37, 048.

[136] *See, e.g.*, PX 1021; PX 2000 -300-01; PX 2078-001, -027, -042, -050; PX 2366; PX 3002-004.

[137] *See, e.g.*, PX 1385-001; PX 1252-002-003;  PX 1046; PX 1044; PX 6010 (Shanteau IH Tr. at 187, 243-46).

The Three Majors also focus on selling "to their existing customers rather than engaging in price wars over each other's customers." *Id.* at 65. Ardagh's customer retention rate in recent years exceeds ███ percent and Saint-Gobain's retention rate is very high as well.[138] ████



Indeed, the Majors approach the market with a common "price over volume" strategy that recognizes their shared incentives to keep capacity "tight" and to avoid "price wars."[141]



███████████ As Ardagh's Vice President of Sales explained: ████████

███████ Defendants' documents also reflect concern about providing competitive bids that could drive glass container prices down.[144]

Defendants use third parties to communicate market information, including details about strategies for pricing and capacity. In 2009, for example, Anchor requested a call with a key

---

[138] ██████ Dep. at 129; ████ Dep. at 189.
[139] ███████████
[140] ███████████
[141] PX 1381-010; PX 2000-222; PX 1054-011; PX 1245-007; PX 1296-059; PX 6010 (Shanteau IH Tr. at 253-54).
[142] *See* PX 2139; PX 6010 (Shanteau IH Tr. at 258).
[143] PX 1049; *see also* PX 6001 (Love IH Tr. at 198).
[144] *See* PX 2142-014; PX 1124-002; PX 1051-001.

industry analyst who was in close contact with O-I and Saint-Gobain.  Anchor informed this analyst of its "desire to play the role of the rational #3 glass provider" and indicated that its "curtailment efforts on capacity and balancing capacity/demand inventory are very consistent with what has been pursued by the leader as well."[145]  Later, this same analyst relayed to Anchor O-I's views concerning how "supply/demand" is being "managed in the US," amongst other information.[146]  In another email exchange, a different analyst sent O-I comments from Anchor's CEO detailing Anchor's top customer accounts and the proportion of revenue associated with each customer.[147]

After the proposed acquisition, "[w]ith only two dominant firms left in the market, the incentives to preserve market shares would be even greater, and the costs of price cutting riskier, as an attempt by either firm to undercut the other may result in a debilitating race to the bottom." *CCC Holdings*, 605 F. Supp. 2d at 67.  As the D.C. Circuit observed in *Heinz*, "[t]he creation of a durable duopoly affords both the opportunity and incentive for both firms to coordinate to increase prices."  246 F.3d at 725.

The D.C. Circuit further explained that "[t]acit coordination 'is feared by antitrust policy even more than express collusion, for tacit coordination, even when observed, cannot easily be controlled directly by the antitrust laws.  It is a central object of merger policy to obstruct the creation or reinforcement by merger of such oligopolistic market structures in which tacit coordination can occur."  *Id.* (quoting 4 PHILLIP E. AREEDA, HERBERT HOVENKAMP & JOHN L. SOLOW, ANTITRUST LAW, ¶ 901(b)(2), at 9 (rev. ed. 1998)).

---

[145] PX 1268-002.

[146] PX 1268-001; *see also* PX4766, PX4767, PX4768, PX4769, PX4770 (additional exchanges with the same analyst).

[147] PX 4308.

### 3. The Acquisition Will Eliminate Head-to-Head Competition Between Ardagh and Saint-Gobain.

The acquisition will also lead to unilateral anticompetitive effects by eliminating head-to-head competition between Ardagh and Saint-Gobain that has benefited consumers. *See Swedish Match*, 131 F. Supp. 2d at 169 ("[A] unilateral price increase . . . is likely after the acquisition because it will eliminate one of Swedish Match's primary direct competitors."); *H&R Block*, 833 F. Supp. 2d at 88-89 (finding unilateral effects likely in merger between second- and third-largest firms in the relevant market); *Staples*, 970 F. Supp. at 1083 (finding anticompetitive effects likely where "merger would eliminate significant head-to-head competition" between merging parties). █████████████████████████████████████████████████████████████████████

███████████████████████████    ████████████████████████████████████████████

███████    Moreover, customers testified that they have achieved lower prices, better service and other benefits due to direct competition between Ardagh and Saint-Gobain.[151]

For example, in 2012, ████████████ issued requests for proposals to the Three Majors for its future glass bottle supply.[152] ████████████ sought a dual-sourcing arrangement for after the expiration, in December 2013, of its current exclusive contract with Ardagh.[153] Ardagh and Saint-Gobain emerged as the two most attractive bidders for ██████████████████████ Ardagh threatened to raise prices if it lost its status as ████████████████ exclusive glass bottle supplier, but

---

[148] *See, e.g.*, PX 1399; PX 1037; PX 1043; PX 2157; PX 1398; PX 2434-016; PX 1543; PX 1399-001; PX 1417-001, -015; PX 1406; PX 2436-003; PX 2437-005; PX 6011 (Ganter IH Tr. at 86); PX 6010 (Shanteau IH Tr. at 56-59, 184-85).

[149] *See, e.g.*, PX 2000-059-66; PX 2007-029-033; PX 1019-003; PX 1264-017.

[150] *See, e.g.*, PX 6001 (Love IH Tr. at 40); PX 1068-019; PX 1226-017; PX 6010 (Shanteau IH Tr. at 235-37); PX 1049.

[151] ███████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

[152] ██████████████████████████████████

[153] ██████████████████████████████████

[154] ██████████████████████████████████

███████ used competitive pressure from Saint-Gobain to get a volume discount from Ardagh
– effectively lowering ██████████ prices.[155]  Similarly, Ardagh and Saint-Gobain were the
two lowest-priced bidders in 2012 negotiations with craft brewer ██████████ which used
competitive pressure from Ardagh to obtain a lower price from Saint-Gobain.[156]

Distillers too benefit from this head-to-head competition.  ████████████ has
used "the threat of switching from Saint-Gobain to Anchor and Owens-Illinois to get better
prices" on its glass bottles.[157]  ████████████████████ similarly testified that
it has benefited from direct competition between Ardagh and Saint-Gobain.[158]  ███



### III.  DEFENDANTS' REBUTTAL ARGUMENTS FAIL, AND, AT BEST, RAISE ISSUES FOR RESOLUTION IN THE ADMINISTRATIVE TRIAL.

Because the acquisition will substantially increase concentration in the relevant markets,
the acquisition is presumptively unlawful.  *See CCC Holdings*, 605 F. Supp. 2d at 36 (quoting
*Baker Hughes*, 908 F.2d at 982).  Defendants bear the heavy burden of rebutting that
presumption.  *See id.* (citing *Heinz*, 246 F.3d at 715).  Neither entry of new competitors nor

---



[155] ████████████████ *see also* PX 1023.
[156] ████████████████
[157] ████████████
[158] ████████████████████

[159] PX 2078-001, -027, -042, -050.
[160] PX 2078-001, -027, -042, -050.
[161] PX 2078-001, -027, -042, -050.

Defendants' claimed efficiencies can extinguish the "serious, substantial" questions of legality raised by the Commission's strong prima facie case.

### A.  High Barriers To Entry And Expansion Exist In The Glass Container Industry.

Barriers to entry in the relevant markets are extremely high, as Defendants' documents and testimony show.  Any potential entry would not be "timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern." *H&R Block*, 833 F. Supp. 2d at 73 (quoting *Merger Guidelines* § 9); *see also United States v. Visa USA, Inc.*, 163 F. Supp. 2d 322, 342 (S.D.N.Y. 2001).

Defendants themselves have often touted the high barriers to entry in the industry.[162]  A 2010 Anchor investment memorandum states, "[i]mports and new market entrants are faced with meaningful barriers to entry, including significant start-up costs (estimated at $200 million for a new plant), high shipping cost of glass containers, long-term customer contracts, extensive mold libraries, and proprietary molding machinery technologies."[163]  The capital investment needed to construct a new glass facility is at least $150-$200 million, and building a greenfield plant would take years for environmental permitting and building.[164]  Indeed, Ardagh admitted in this action that it believes there are high barriers to entry, "which include significant capital requirements, extensive technology and manufacturing know-how and existing customer relationships."[165]

Meaningful expansion by fringe firms is unlikely for many of the same reasons that stymie new entry, especially since none of the fringe firms has more than one glass container

---

[162] *See, e.g.*, PX 1336-057; PX 1247-008.

[163] PX 1247-008.

[164] PX 1075-081; PX 2050-036; PX 6003 (Wilkes IH Tr. at 149); PX 6004 (Fredlake IH Tr. at 47); ▮▮▮▮▮▮▮▮▮▮▮▮▮

[165] Ardagh Response to Request for Admission 21.

plant.  Plus, many of the fringe firms would require sizable infrastructure investments to produce the types of beer and spirits bottles that the Three Majors make today.[166]

The possibility of further vertical integration by large customers also fails to meet the legal threshold for timely, likely, and sufficient entry.



**B.  Defendants' Efficiency Claims Are Largely Unfounded.**

Defendants argue that the ███ million in efficiencies Ardagh hopes to achieve from the acquisition will negate any anticompetitive effects.[170]  Courts "have rarely, if ever, denied a preliminary injunction solely based on the likely efficiencies." *CCC Holdings*, 605 F. Supp. 2d at 72.  "[I]n a highly concentrated market characterized by high barriers to entry," such as here, Defendants "must provide 'proof of extraordinary efficiencies' in order to rebut the presumption of anticompetitive effects." *Id.* (quoting *Heinz*, 246 F.3d at 720).  Defendants cannot do so.

---

166 ███████████████

167 ███████████

168 █████████████

169 

170 *See* PX 1197-014.

Cognizable efficiencies must be (1) merger-specific and (2) verifiable. *H&R Block*, 833 F. Supp. 2d at 89; *see also Heinz*, 246 F.3d 721-22; *Merger Guidelines* § 10. Defendants' efficiency claims largely fail to meet these elements. For instance, Defendants claim they will save ██████ by reducing overhead within the Saint-Gobain organization. This ████ ████ claim relates to the staffing of the current Saint-Gobain organization *alone* and is separate from any additional savings to be reaped from eliminating staff positions made redundant by the combination of Ardagh and Saint-Gobain. Thus, the claim is not merger-specific. If Saint-Gobain is not staffed efficiently today, it can cut those costs on its own. This claim is also not verifiable because Ardagh has made no effort to identify which current Saint-Gobain employees have redundant responsibilities,[171] and Ardagh assumes, without investigation, that none of these purportedly superfluous workers are, in fact, necessary.

As if to highlight the speculative nature of their efficiency claims, Defendants have actually increased their claims by ████ since they announced the acquisition.[172] The basis for this change was not new information, but simply a desire to be less "conservative."[173] The Court should disregard these unverifiable and non-merger-specific claims.

## IV.    THE PUBLIC INTEREST STRONGLY FAVORS PRELIMINARY RELIEF TO PRESERVE THE STATUS QUO.

Allowing this acquisition to close before trial would irreparably harm the public interest. Congress enacted Section 13(b) of the FTC Act to make "injunctive relief [] broadly available to the FTC." *Heinz*, 246 F.3d at 714 (citation omitted). Because "'experience shows that the Commission's inability to unscramble merged assets frequently prevents entry of an effective order of divestiture' after administrative proceedings, the court must place great weight on the

---

[171] PX 6005 (Riordan IH Tr. at 192-194).
[172] PX 1192-001.
[173] PX 6005 (Riordan IH Tr. at 34-36).

public interest in blocking a possibly anticompetitive merger before it is complete." *Whole Foods*, 548 F.3d at 1050 (Tatel, J.) (quoting *FTC v. Dean Foods Co*., 384 U.S. 597, 607 n.5 (1966)); *see also Heinz*, 246 F.3d at 726.

The merits trial begins on December 2nd.  Preserving the status quo during the administrative trial will protect the public interest and will not harm Defendants, who have committed to litigating the merits of the acquisition.  They can continue operating as usual until the trial is over.  Defendants may claim a delay in the acquisition would harm them, but such private harms are accorded "little weight, lest we undermine [S]ection 13(b)'s purpose of protecting the public-at-large, rather than the individual private competitors." *Heinz*, 246 F.3d at 727 n.25 (citing *FTC v. University Health, Inc*., 938 F.2d 1206, 1225 (11th Cir. 1991) (internal quotation omitted)); *see also id.* ("Private equities do not outweigh effective enforcement of the antitrust laws.") (quoting *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083 (D.C. Cir. 1981)). Because this acquisition raises serious questions of illegality, the public interest strongly favors a preliminary injunction "until [the] FTC can perform its function." *Id.* at 726 (citing *Food Town Stores*, 539 F.2d at 1346).

## CONCLUSION

For the reasons explained above, the Federal Trade Commission respectfully requests that this Court grant its motion for a preliminary injunction and prevent Ardagh from closing its acquisition of Saint-Gobain pending a full administrative trial to determine the legality of the acquisition under the antitrust laws.

September 26, 2013

Respectfully submitted,

Of counsel:

/s/ Edward D. Hassi

DEBORAH L. FEINSTEIN (D.C. Bar 412109)
Director
NORMAN A. ARMSTRONG, JR. (D.C. Bar 459621)
Deputy Director
Bureau of Competition
Federal Trade Commission

EDWARD D. HASSI
Chief Litigation Counsel
Federal Trade Commission

*Bureau of Competition*
600 Pennsylvania Ave., NW
Washington, DC 20580
Telephone: (202) 326-2470
Facsimile: (202) 326-2884
Email: ehassi@ftc.gov

JONATHAN NUECHTERLEIN (D.C. Bar 442470)
General Counsel
Federal Trade Commission

*Attorney for Plaintiff*

CATHARINE M. MOSCATELLI
Assistant Director (D.C. Bar 418510)

BRENDAN J. MCNAMARA
Deputy Assistant Director

ANGELIKE A. MINA
SEAN D. HUGHTO (D.C. Bar 421224)
STEVEN L. WILENSKY (D.C. Bar 430398)
MONICA M. CASTILLO
ANGEL PRADO
JAMES ABELL (D.C. Bar 990773)
MEREDITH ROBINSON (D.C. Bar 498245)
JOSHUA GOODMAN
MICHAEL FRANCHAK
STEVEN DAHM
DANIELLE SIMS (D.C. Bar 982506)
KRISTIAN ROGERS
AMANDA HAMILTON (D.C. Bar 499646)
SEBASTIAN LORIGO
VICTORIA LIPPINCOTT (D.C. Bar 473839)

Attorneys

Federal Trade Commission
Bureau of Competition
Mergers II Division

NAME GLOSSARY

**REDACTED IN ENTIRETY**