**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FEDERAL TRADE COMMISSION,

                Plaintiff,

                v.

ARDAGH GROUP, S.A.,
COMPAGNIE DE SAINT-GOBAIN, and
SAINT-GOBAIN CONTAINERS, INC.,

                Defendants.

Case No. 1:13-CV-01021 (BJR)

**PUBLIC VERSION**

<u>**PLAINTIFF'S REPLY MEMORANDUM OF LAW**</u>
<u>**IN FURTHER SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**</u>

# REDACTED VERSION

# FOR PUBLIC FILING*

*The Federal Trade Commission files this non-confidential redacted version of its Reply Memorandum of Law in Further Support of its Motion for Preliminary Injunction, filed September 30, 2013. The Protective Order requires all information designated "Confidential" to be redacted from the public version of the pleading filed with the court. Although Defendants designated all information and documents redacted in this Memorandum as "Confidential," most of the information does not appear to be commercial information, the disclosure of which would cause injury to their businesses.

## TABLE OF CONTENTS

INTRODUCTION………………………………………………………………………………... 1

ARGUMENT……………………………………………………………………………........... 4

I.   THE FTC HAS RAISED "SERIOUS, SUBSTANTIAL" ISSUES APPROPRIATE FOR AN ADMINISTRATIVE TRIAL. …………………………………………………………..4

II.   DEFENDANTS DENY AND MISREPRESENT BASIC FACTS ABOUT THE INDUSTRY………………………………………………………………………........... 5
   A.   Defendants' Puzzling Account Of Competition Is Not Credible………………………… 5
   B.   Defendants' Paid Litigation Consultants Are Not Credible……………………………… 6
   C.   The Documentary And Testimonial Record Is The Best Evidence Of The Facts……….. 9
   D.   Defendants' Market Trend Arguments Are Misleading, Irrelevant, Or Both……………11

III.   DEFENDANTS MISINTERPRET AND MISAPPLY CASE LAW………………………13

IV.   THE RELEVANT GEOGRAPHIC MARKET IS THE UNITED STATES……………… 19

V.   THE TRANSACTION WILL LIKELY LEAD TO REDUCED COMPETITION AND HIGHER PRICES…………………………………………………………………………… 21
   A.   There Are Extraordinarily High Barriers To Entry and Expansion…………………….. 22
   B.   The Proposed Acquisition Will Eliminate Head-to-Head Competition Between Ardagh and Saint-Gobain………………………………………………………………………... 22
   C.   The Relevant Markets Are Ripe For Coordination……………………………………... 23
   D.   Defendants' Speculative Efficiencies Claims Fail……………………………………… 24

VI.   THE EQUITIES STRONGLY FAVOR PRELIMINARY RELIEF………………………25

CONCLUSION……………………………………………………………………………....... 25

### INTRODUCTION

Relying on Defendants' ordinary business documents and the testimony of Defendants' own executives and customers, the Commission's opening brief showed how Ardagh's proposed acquisition of Saint-Gobain would create a duopoly in two relevant markets with high barriers to entry and conditions ripe for coordination.  Those markets are the manufacture and sale of glass containers to (1) Brewers and (2) Distillers.  In response, Defendants rely on faulty legal arguments, misleading depictions of market trends, and the outright denial of basic facts about their own industry.  Indeed, the assertions in Defendants' brief and the report of their hired economist are truly remarkable in their detachment from the reality of the marketplace.  Defendants ask this Court to believe that:

- "[G]lass container manufacturers do not set . . . prices based on competition with each other."[1]

- "There Is Only Limited Competition Between Ardagh and [Saint-Gobain]."[2]

- "[W]hatever it is that constrains the defendants' pricing to beer customers, it is not rivalry with each other or O-I."[3]

These stunning claims are irreconcilable with Defendants' own business documents and the testimony of Defendants' own executives and customers, plastic and metal container companies, and Defendants' only other major glass competitor, Owen-Illinois.  For example:

- Ardagh stated in a securities offering last year: "We are subject to intense competition from other glass container producers against whom we compete on the basis of price, quality, customer service, reliability of delivery and marketing."[4]

- It is undisputed that glass container suppliers bid against each other to win contracts from Brewers and Distillers, but do not bid against plastic and metal suppliers.[5]

---

[1] Defendants' Memorandum of Law in Opposition to the Federal Trade Commission's Motion for a Preliminary Injunction ("Def. Br.") at 4.

[2] Def. Br. at 31.

[3] Sanghvi Report ¶ 181.

[4] PX 1393-071.

- Many Brewers and Distillers have testified that they use bidding among glass container suppliers to get better prices and other benefits.

- Brewers and Distillers do not change their brands' packaging based on variations in the relative prices of glass, metal, or plastic containers.

- Metal can and plastic bottle companies testified that they do not compete directly with glass. ████████████████████████████████████████████
████████████████████████████████████████████

Defendants simply hide from or deny the facts they would rather not acknowledge. Twenty-eight different Brewers and Distillers provided deposition testimony in this case. These witnesses included many of the largest and best-known Brewers and Distillers in the United States. Nine of Defendants' own top executives also testified, and Defendants and third parties produced well over two million documents. The weight of this extensive body of evidence unquestionably supports the Commission's case. For that reason, Defendants' brief attempts to minimize the value of the documentary and testimonial evidence and repeatedly relies, instead, on the made-for-litigation pronouncements of Defendants' own paid consultants (who unsurprisingly echo the Defendants' brief).

Since the facts of this case so clearly illustrate why Defendants' proposed acquisition must be enjoined, Defendants seek to focus on the facts of other cases from decades ago. Defendants' reliance on cases such as *United States v. Continental Can. Co*, 378 U.S. 441 (1964) and *In re Owens-Illinois*, 115 F.T.C. 179 (1992) is misplaced. As explained below, Defendants misinterpret those rulings and improperly ask this Court to rely on their factual findings, which are irrelevant here. Curiously, Defendants' interest in historical cases does not extend to Anchor's own, more recent 2001 antitrust lawsuit, which they address only in a footnote.

---

[5] *See, e.g.,* ████████████████ PX 1491-006; PX 1533-002; ████████████████
████████████████████████

[6] ████████████████████████████████

Defendants cannot explain why the Court should ignore Anchor's admissions that the relevant antitrust markets for assessing a merger among major glass suppliers exclude cans and plastic bottles.  As Anchor avowed, "customers depend on competition among glass container manufacturers to keep prices down," and "[f]or a substantial percentage of purchasers of glass containers, substitution of other materials such as plastic would not be feasible" in response to an increase in the price of glass containers.[7]

Defendants' silence is often telling.  Defendants do not contest the extraordinarily high barriers to entry in this industry.  Defendants also do not contest that the relevant geographic market for Distillers is the United States, and they concede that the relevant geographic market is no broader than the United States for Brewers.  Defendants cavil that the relevant geographic market for sales to Brewers should be analyzed on a "local or perhaps regional" basis, but, as explained below, the United States is the appropriate geographic market for sales to Brewers.

Given the absence of any direct price competition between glass containers and plastic or metal containers, Defendants' brief parses long-term industry statistics in a misleading attempt to argue that "glass container manufacturers are fighting a losing battle against the makers of metal and plastic containers."[8]  This dismal portrayal of the glass container industry is at odds with the facts.  For example, the proportion of beer packaged in cans versus glass bottles is almost exactly the same today as it was thirty years ago, and that ratio has remained quite stable over that period, even as the price of glass containers relative to cans has risen approximately 80 percent.[9]  Ardagh's own eagerness to spend $1.7 billion on its third purchase of a U.S. glass container firm in two years also belies Defendants' dire projections.  Moreover, Defendants'

---

[7] PX 1379 (Am. Complaint) ¶ 12.

[8] Def. Br. at 1.

[9] PX 4067 (Beer Institute Brewers' Almanac 2012, "Package Mix Chart"); PX 0006 (Expert Report of Dr. Frederick Warren-Boulton) ¶ 51.

long-term trend arguments are beside the point.  Comparative demand trends for glass bottles and metal or plastic containers are largely irrelevant where, as here, the products are not economic substitutes and the sales of one do not respond to relative price changes of the other.

The merits trial in this case begins on December 2nd at the FTC.  The evidence shows that the proposed acquisition is likely to lead to a durable duopoly and result in anticompetitive effects in two relevant product markets.  The Commission has undeniably identified questions "going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals."  *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 714-15 (D.C. Cir. 2001).  Because preserving the status quo during the merits trial is necessary to protect the public interest, this Court should grant the Commission's motion for a preliminary injunction.[10]

## ARGUMENT

### I.   THE FTC HAS RAISED "SERIOUS, SUBSTANTIAL" ISSUES APPROPRIATE FOR AN ADMINISTRATIVE TRIAL.

Defendants and the FTC appear to agree on the standard governing the FTC's right to injunctive relief under Section 13(b) of the FTC Act.[11]  "[T]he standard for likelihood of success on the merits is met" here because "the FTC has raised questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals."  *Heinz*, 246 F.3d at 714-15 (quotation omitted).  Defendants' arguments do not come

---

[10] Injunctive relief is particularly important here where, cognizant of the strength of the Commission's case, Defendants' opposition brief disclosed for the first time a professed intent to sell certain glass plants to an unidentified third party and to freeze prices for certain customers.  Absent an injunction, a sale of plants to an unvetted third party could put those plants out of reach of any remedy to be fashioned by the Commission if the transaction is held to be anticompetitive following the merits trial.  At the pre-hearing conference on September 24, 2013, this Court excluded Ardagh's remedial efforts from the hearing.  Accordingly, the Commission will not address them further in this brief.

[11] *See* Plaintiff's Memorandum of Law in Support of Its Motion for Preliminary Injunction ("FTC Br.") at 12-15; Def. Br. at 7-8.

close to extinguishing the "serious, substantial" questions going to the merits.  No compelling public equities favor allowing Ardagh to acquire Saint-Gobain before the conclusion of the merits trial that begins on December 2nd.  Rather, the public interest in effective antitrust enforcement strongly favors preliminary relief because it is necessary to preserve an adequate remedy.  Thus, preliminary relief is warranted.

## II.   DEFENDANTS DENY AND MISREPRESENT BASIC FACTS ABOUT THE INDUSTRY.

### A. Defendants' Puzzling Account Of Competition Is Not Credible.

In Defendants' remarkable account of their own industry, "glass container manufacturers do not set . . . prices based on competition with each other,"[12] and "there is only limited competition between Ardagh and [Saint-Gobain]."[13]  While denying the obvious – that glass container firms compete with each other on price – Defendants simultaneously insist that glass container prices are closely constrained by competition with plastic and metal containers.[14]  This illogical account of competition cannot be reconciled with Defendants' own business documents, the testimony of their executives, and the testimony of their Brewer and Distiller customers.

In fact, each of the Three Majors in the glass container industry treats the other two as its primary competitors,[15] and the Three Majors bid against each other – competing on price – for the business of Brewers and Distillers.[16]  That's why Ardagh told investors last year that it faces "intense competition from other glass container producers against whom we compete on the

---

[12] Def. Br. at 4.

[13] Def. Br. at 31.

[14] *See* Def. Br. at 4-6, 15-24.

[15] ███████████████████████ PX 1264-017; PX 6001 (Love IH Tr. at 38-40); PX 2000-048-058 ████████████████ -059-066 ████████████████ *cf.* Grewe Dep. at 94-98.

[16] ████████████████████████████████████████████████████
████████████████████████████████████████████████████

basis of price, quality, customer service, reliability of delivery and marketing."[17]  Indeed,

Defendants admit that over ■ percent of the revenue from each Defendant's most significant

lost sales to Brewers and Distillers in the past decade went to another glass supplier.[18]



## B.  Defendants' Paid Litigation Consultants Are Not Credible.

Simply put, Defendants' ordinary business activities would make absolutely no sense if

the account of competition in Defendants' brief is to be believed.  Thus, Defendants essentially

ask the Court to ignore most of the documentary and testimonial evidence, and instead rely

---

[17] PX 1393-071.

[18] *See* FTC Br. at 23-24 n.87 (citing Defendants' request for admission responses).

[19] PX 1264-017; PX 1535; PX 2000-292, -340; PX 1033-009.

[20] PX 1021; PX 1418; PX 1068-025; PX 2366.

[21] PX 1067-020; PX 1068-036; PX 2019-036, -037, -048.

[22] PX 1047 (attachment); Love Dep. at 154-55.

[23] PX 1534; PX 1535; PX 1021; PX 2366; 1049-001; PX 2000-048-058 ■■■■■■■■■ -059-066
■■■■■■■■■ *cf.* Grewe Dep. at 94-98.

[24] ■■■■■■■■■■■■■■

[25] ■■■■■■■■

primarily on the sources that undergird their brief: a cherry-picked assortment of articles they found on the internet and the pronouncements of a coterie of highly paid litigation consultants, most of whom are utterly unqualified to opine on the relevant issues.[26]

Three of Defendants' consultants – Raymond Bourque, Rob Wallace, and Michael Kallenberger – opine on topics for which they are unqualified to provide expert testimony. These hired consultants bring no recognized methodologies or useful analytical tools to bear on the facts. For example, Mr. Wallace, who has already been disqualified from testifying by at least two other courts, reached his opinions here by relying on approximately 40 websites, but not a single business document from either Ardagh or Saint-Gobain.[27] The Commission has separately filed a motion in limine to exclude the testimony of these unqualified consultants.

Defendants also rely heavily on their hired economist, whose flawed analysis underlies many of the most astonishing claims in Defendants' brief. For example, he asserts that:

- "[D]efendants are not meaningful competitors with one another…regardless of the definitions of the relevant markets"[28]

- "Glass suppliers do not impact one another's pricing."[29]

- "There is little competitive interaction between the defendants for beer and spirits customers even within a 'glass-only' market."[30]

- "[W]hatever it is that constrains the defendants' pricing to beer customers, it is not rivalry with each other or O-I."[31]

---

[26] *See, e.g.*, Def. Br. at n.30-34, 37-40 (citing internet sources); Def. Br. at n.1, 3-6, 8-10, 13, 15, 17 (citing experts in "Background" section); Def. Br. at n.24, 27-33, 35, 46, 49 (citing experts in section addressing "[d]evelopments since *Continental Can* and *Owens-Illinois*").

[27] Report of Rob Wallace, Appendix D; Wallace Dep. at 35; *See Akiro v. House of Cheatham, Inc.,* No. 12 Civ. 5775, 2013 U.S. Dist. LEXIS 72233, at *12 (S.D.N.Y May 17, 2013) (noting Wallace's report "simply dresses up [defendant's] view of the underlying factual evidence in expert garb."); *Patsy's Italian Rest., Inc., v. Banas*, 531 F. Supp. 2d 483 (E.D.N.Y. 2008) (excluding Wallace's testimony).

[28] Sanghvi Report ¶ 18.

[29] Sanghvi Report § V.B. Heading.

[30] Sanghvi Report § V.C. Heading.

[31] Sanghvi Report ¶ 181.

Such claims fly in the face of Defendants' own business documents, the testimony of Defendants' customers, and the explicit testimony of the Three Majors' own executives. For example:

- Many Brewers and Distillers have testified that they use bidding among glass suppliers to get better prices or other benefits.[32]

- Saint-Gobain's Vice President of Sales for Beer testified that competition between glass suppliers resulted in lower prices for ████████████████████ ████████████████████████████████████████.[33]

- Saint-Gobain's General Manager and Senior Vice President of the Beer Sector of Activity testified that competition between glass suppliers resulted in lower prices for ████████████████████.[34]

- ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████

- Ardagh's Vice President of Sales identified Saint-Gobain and O-I as the two companies Ardagh most frequently bids against in requests for pricing for both beer and spirits bottles.[36]

- ████████████████████████████████████████████████ ████████████████████████████████████

The conclusions of Defendants' economist can thus be dismissed on their face because they are incompatible with the basic facts of the industry. It defies common sense to assert that the prices charged by glass suppliers are <u>not</u> constrained by direct, head-to-head competition with other glass suppliers, yet <u>are</u> constrained by the more remote possibility of customers

---

[32] ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████

[33] PX 6010 (Shanteau IH Tr. at 14-15, 30-32, 57, 62, 73-74, 184-85, 206-209).

[34] PX 6011 (Ganter Tr. at 44-46, 86, 137-38).

[35] PX 2078-001, -027, -042, -050.

[36] Love Dep. at 74.

[37] ████████████████████████████████████

switching to plastic or metal containers.[38]  The details of Defendants' economic analysis only further underscore a fundamental detachment from the business reality.  Defendants' economist spends pages of his report developing his own abstruse mathematical formula to model glass container suppliers' pricing decisions,[39] but there is no evidence that this formula, or the assumptions underlying it, has any connection to how Defendants' executives actually make pricing decisions, as revealed by their own testimony.[40]  For all of these reasons, the Court should simply disregard the analysis of Defendants' hired economist.[41]

### C. The Documentary And Testimonial Record Is The Best Evidence Of The Facts.

While emphasizing their litigation consultants' dubious pronouncements, Defendants ask this Court to disregard their own *pre-litigation* business documents, arguing incorrectly that the D.C. Circuit has somehow minimized the evidentiary importance of such documents.[42]  To the contrary, "[w]hen determining the relevant product market," courts in this Circuit "often pay close attention to the defendants' ordinary course of business documents," *United States v. H&R*

---

[38] *See* PX 0014 (Expert Rebuttal Report of Dr. Frederick Warren-Boulton) ¶¶ 16-26.

[39] Sanghvi Report at 53-56.

[40] *See* Wall Dep. 91-94.

[41] A complete, point-by-point refutation of all the claims of Defendants' economist can be found in the rebuttal report of the Commission's economic expert.  *See generally* PX 0014 (Expert Rebuttal Report of Dr. Frederick Warren-Boulton).

[42] Defendants observe that the D.C. Circuit noted that "industry recognition" is often less significant in determining whether two products are in the same relevant product market than more direct economic indicia, such as "unique production facilities," "distinct prices," and "sensitivity to price changes." *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 219 n.4 (D.C. Cir. 1986).  But Defendants incorrectly conflate "industry recognition," one of the substantive indicia of a relevant product market, with the wholly separate *evidentiary* question of whether Defendants' business documents consitute compelling evidence of the market reality.  Def. Br. at 24.  Courts in this Circuit undeniably put great evidentiary weight on business documents. *See, e.g., United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 52 (D.D.C. 2011); *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1079 (D.D.C. 1997).  Here, those documents provide abundant evidence of both "industry recognition" as well as the more direct economic indicia supporting the Commission's case.  For example, Defendants, along with other glass container manufacturers, belong to a trade association called the "Glass Packaging Institute."  This trade association is one example of "industry recognition" supporting the conclusion that glass containers are not in the same relevant product market as plastic or metal containers. ████████████████████████████████

████████████████████████████████████████████████████████████████

*Block, Inc.*, 833 F. Supp. 2d 36, 52 (D.D.C. 2011), because determination of the relevant market "is a matter of business reality—a matter of how the market is perceived by those who strive for profit in it." *FTC v. Staples*, *Inc.*, 970 F. Supp. 1066, 1079 (D.D.C. 1997) (quoting *FTC v. Coca-Cola Co.*, 641 F. Supp. 1128, 1132 (D.D.C. 1986)).

Defendants also deride the testimony of their own customers, which is hardly surprising since the customer testimony consistently refutes Defendants' arguments.[43]  Courts in merger cases often consider customer testimony.  *See, e.g.*, *FTC v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, 41 (D.D.C. 2009) (citing customer testimony about whether products are "adequate substitute[s]").  Here, the Brewers' and Distillers' testimony is especially credible because (1) it is consistent across the large number of Brewers and Distillers who testified in this case; (2) it is consistent with the facts revealed in other sources, such as Defendants' documents; and (3) it does not consist of mere "subjective" opinions.  Rather, Brewers and Distillers analyze their consumers carefully and know that there is strong demand for their products in glass bottles.



---

[43] Def. Br. at 22-23.

[44] ▮▮▮▮▮▮

[45] PX 4106-015.



None of Defendants' paid litigation consultants have conducted any remotely comparable quantitative analyses of how container preferences influence consumer purchase behavior for beer and spirits.  The Court should credit the testimony of Brewers and Distillers because it is well founded, reliable, and consistent with other record facts, which all point to one unassailable conclusion:  Brewers and Distillers will continue to buy glass bottles, even if prices increase five to ten percent, because their consumers demand them.

### D.  Defendants' Market Trend Arguments Are Misleading, Irrelevant, Or Both.

After stripping away the flawed pronouncements of Defendants' paid consultants, most of what remains of Defendants' factual arguments relies on misleading or irrelevant inferences drawn from supposed market trends.  These arguments fail.

Demand for beer and spirits in glass bottles will continue to exist, and, indeed, ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[49]  Further, Defendants' suggestion that cans are "displacing" glass beer bottles is bogus.[50]  As noted above, the proportion of beer packaged in cans versus glass bottles is almost exactly the same today as it was thirty years ago, and the ratio has remained relatively stable even as the price of glass bottles

---

[46] PX 4112-006.

[47] PX 4106-015, PX 4112-006 (emphasis added).

[48] PX 4106-040.

[49] PX 1361-0031-32; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[50] Def. Br. at 15.

has risen approximately 80 percent relative to cans.[51]  Defendants' reference to the growth of

"craft" beer in cans is also a red herring.  Craft beer remains overwhelmingly packaged in glass

bottles; more than 95 percent of all craft beer is sold in glass.[52]  Moreover, major craft brewers,

such as ████████████████████, testified that they introduced canned beers to capture

additional sales volumes, not to replace glass bottles.[53]  Defendants conveniently neglect to

mention that, while the number of craft breweries offering canned beer has increased in recent

years, the total number of craft breweries and their demand *for glass bottles* has also increased,

as their own expert admitted.[54]  Craft beer offerings in both bottles and cans have expanded in

what one Brewer described as an overall "explosion" in craft beer during the past decade.[55]

As for spirits, Defendants' argument is also based on misleading evidence.  Defendants'

chart citing only "off-premises" spirits consumption (i.e., outside of bars and restaurants) skews

the data because it ignores the fact that on-premises spirits consumption accounts for half of all

spirits sales revenues and the fact that 1-liter glass spirits bottles are the "industry standard" for

bars and restaurants.[56]  Similarly, Defendants' choice to cite a single ███████████ effort by

---

[51] PX 4067 (Beer Institute Brewers' Almanac 2012, "Package Mix Chart").  PX 0006 (Expert Report of Dr.
Frederick Warren-Boulton) ¶ 51.  In a footnote, Defendants inexplicably suggest that looking at the ratio of bottled
to canned beer over the past thirty years is somehow "misleading because it does not account for the rise of craft and
premium beer," a development that certainly occurred within that period.  Def. Br. n.11.  In fact, it is Defendants'
parsing of the data, which looks only at changes in this ratio from 2004 to 2012, that is misleading because the
central economic event during this period was the worldwide recession that began in 2008.  The recession led to an
increase in consumption of cans relative to glass bottles as consumers reduced their outings to bars and restaurants
(more likely to serve glass bottles) and traded down to cheaper brands (more likely to be in cans).  PX 1378-016;
████████████████████████

[52] PX 8006-039 (IRI market research data showing that cans accounted for only 3.1% dollar share of craft beer in
2012); PX 2094-011 ████████████████████████████████████████████

[53] ████████████████████████████████████████████

[54] Kallenberger Dep. at 108.

[55] ████████████████████████

[56] PX 1634-047; ████████████████████████████████████████

Distiller ███████ relating to plastic ignores the further advanced and more valuable ██████

████████ effort by the same Distiller to improve glass bottle technology.[57]

Defendants' long-term trend arguments are ultimately beside the point when it comes to defining the relevant antitrust product markets. The evidence here shows that glass container manufacturers compete directly on price with each other, and not with plastic or metal container suppliers. The fact that Brewers and Distillers continue to spend billions of dollars purchasing large volumes of glass containers, even though plastic and metal containers are generally cheaper and have been available for decades is strong evidence that these are different relevant product markets. The testimony of Defendants' own executives confirms that customers who convert a product from glass to another material generally do not offer the glass firms a chance to compete against the new material, but rather present their decision as ███████████[58]

### III.   DEFENDANTS MISINTERPRET AND MISAPPLY CASE LAW.

Defendants argue that three decades-old merger rulings "foreclose the FTC's market definitions here."[59] Defendants are wrong. The fact-bound assessments of relevant markets in those historical cases – *United States v. Continental Can Co.*, 378 U.S. 441 (1964); *FTC v. Owens-Illinois, Inc.*, 681 F. Supp. 27 (D.D.C. 1988) ("*Owens-Illinois P.I. Opinion*"), *vacated as moot*, 850 F.2d 694 (D.C. Cir. 1988); and *In re Owens-Illinois, Inc.*, 115 F.T.C. 179 (1992) ("*Owens-Illinois FTC Opinion*") – cannot possibly "foreclose" this Court's decisions on the present record, nor can those cases be construed as "controlling" as to the relevant markets here.

---

[57] ███████████████ PX 4828; PX 4405. The notion that the cost savings to be realized by plastic "are simply too good to pass up," Def. Br. at 19, belies the reality that the cost savings of packaging spirits in plastic are often too good to be true, considering how plastic packaging may jeopardize a brand and its sales. For that reason, plastic is largely shunned by premium and super-premium brands. ████████████████████████

████████████████████████████████

[58] PX 6004 (Fredlake IH Tr. at 258); *see also* Grewe Dep. at 107.

[59] Def. Br. at 8.

First, the market definition determinations in those cases – as in every antitrust case – were "factual findings" based on "supporting record evidence." *United States v. Microsoft Corp.*, 253 F.3d 34, 52 (D.C. Cir. 2001) (*en banc*, *per curiam*); *accord FTC v. Lundbeck, Inc.*, 650 F.3d 1236, 1239 (8th Cir. 2011) ("The relevant product market is a question of fact," and decisions on such questions must be "supported by substantial evidence.") (citations omitted).  Indeed, the very decisions that Defendants invoke make it unequivocally clear that "the pivotal question of relevant market can be determined only after close scrutiny of the facts in each case."  *Owens-Illinois P.I. Opinion*, 681 F. Supp. at 35; *see also Continental Can*, 378 U.S. at 457 ("relevant product market" was determined "[b]ased on the evidence . . . revealed by this record").  The evidentiary records in the *Continental Can* and *Owens-Illinois* cases are not before this Court, and the competitive dynamics of certain markets in the early 1960s and late 1980s are irrelevant to the issues this Court is called upon to decide.  Product market definition is a question of fact that this Court can decide *only* based on the evidentiary record before it.

Second, apart from improperly attempting to import facts from the cases they cite, Defendants misconstrue those cases legally.  Even if market conditions had remained frozen in amber for the past 50 years, *Continental Can* still would not dictate this Court's findings. *Continental Can*'s general legal standards remain valid, but the economic theories and methodologies used to apply those standards to the facts have changed dramatically.  The D.C. Circuit has made clear that courts' understanding of the types of market arrangements that are "likely to harm consumers" will necessarily change "as economic learning and market experience evolve."  *Polygram Holding, Inc. v. FTC*, 416 F.3d 29, 36-37 (D.C. Cir. 2005).  Thus, lower courts, of course, are bound by the legal principles articulated in earlier Supreme Court decisions, such as the principle that, in assessing product market definition, "[w]hat is called for

is an appraisal of the 'cross-elasticity' of demand in the trade." *E.I. du Pont & de Nemours & Co.*, 351 U.S. 377, 394 (1956) ("*Cellophane*").[60]  But courts applying those principles today must do so in light of modern economic analysis.[61]  The "application of the antitrust laws to mergers during the past half-century has been anything but static." *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1111 (N.D. Cal. 2004).

Here, modern economic analysis forecloses Defendants' wooden reliance on the product market definition in *Continental Can*.  In that case, while "[g]lass and metal containers were recognized to be two separate lines of commerce," 378 U.S. at 456, each of which could "constitute [a] product market[] for antitrust purposes," *id.* at 458 (citing *Brown Shoe*, 370 U.S. at 325), the Court concluded that they should nonetheless be combined into a single, broader "relevant product market."  *Id.* at 457.  By contrast, today, it is nearly universally recognized— including by courts in this Circuit—that "the relevant product market should ordinarily be defined as the smallest product market that will satisfy the hypothetical monopolist test."  *H&R Block, Inc.*, 833 F. Supp. 2d at 59; *accord FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028, 1037-38 (D.C. Cir. 2008) (Brown, J.); *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 120 (D.D.C. 2004); *Staples,* 970 F. Supp. at 1074-75; *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 159 (D.D.C. 2000); *Merger Guidelines*, §§ 4, 4.1.1.  The *Owens-Illinois FTC Opinion* includes a well-articulated explanation of this "smallest product market" principle.  *See* 115 F.T.C. at 298- 303.  Indeed, Defendants fail to acknowledge that the *Owens-Illinois FTC Opinion*'s application

---

[60] *See also Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1961) (product market boundaries defined primarily based on "cross-elasticity of demand between the product itself and substitutes for it"); *Continental Can*, 378 U.S. at 449 (quoting and relying on the same passages from *Cellophane* and *Brown Shoe*); *FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028, 1043 (D.C. Cir. 2008) (Tatel, J.) (same); *CCC Holdings*, 605 F. Supp. 2d at 38 (same); *H&R Block*, 833 F. Supp. 2d at 50-51 (same).

[61] For a comprehensive overview in the substantial evolution of how courts have applied the principles of relevant market definition from the 1950s to the 1990s, *see* Gregory J. Werden, *The History of Antitrust Market Delineation*, 76 MARQUETTE L. REV. 123 (1992).  Those principles have continued to evolve, as a comparison of the 1992 and 2010 Horizontal Merger Guidelines illustrates.

of economic principles to product market definition differs sharply from the economic analysis

in *Continental Can* and the *Owens-Illinois P.I. Opinion*.[62]

Even on its own terms, *Continental Can* concerned an entirely distinguishable transaction

– a merger of a metal can producer and a glass container producer.  As *Continental Can*

specifically recognized, the fact "[t]hat there may be a broader product market made up of metal,

glass and other competing containers does not necessarily negative the existence of submarkets

of . . . glass, plastic or cans [that] . . . in themselves, constitute product markets for antitrust

purposes."  378 U.S. at 457-58.  Thus, *Continental Can* itself suggests that the Court could have

defined a glass-only relevant market if the case had involved a merger of two glass suppliers.  In

the *Owens-Illinois FTC Opinion*, the Commission emphasized this very point in distinguishing

*Continental Can* – and distinguishing by extension the *Owens-Illinois P.I. Opinion*, which did

not recognize this distinction.[63]  115 F.T.C. at 302-303.  Ironically, then, it is Defendants who

ignore the teaching of *Continental Can* when they argue for mechanically applying the same

broad product market that the Court used to assess the "long-run" "inter-industry" competition at

issue there to evaluate this merger of two close competitors.

Contrary to Defendants' arguments, nothing in the *Owens-Illinois FTC Opinion* undermines

the Commission's arguments here for defining product markets consisting of glass containers sold to

---

[62] Instead of applying the smallest product market principle, the *Owens-Illinois P.I. Opinion* mistakenly relied on *Cellophane* for the contrary proposition that, in analyzing product market definition, "competitive effects within smaller parts of the market are not relevant."  681 F. Supp. at 35 (citing *Cellophane*, 351 U.S. at 395).

[63] As noted in the Commission's opening brief (and in the *Owens-Illinois FTC Opinion*), Judges Posner and Easterbrook have also pointed out that *Continental Can* strongly suggests that the Court there would have recognized a glass-only relevant market if the case had involved a merger of two glass suppliers.  FTC Br. at 33. Tellingly, Defendants ignore the substance of Posner and Easterbrook's analysis, and instead simply attack the notion of citing to scholarly opinion.  Def. Br. at 10.  Defendants' citations, *id.* at 10 n.20, also misleadingly intimate that Posner and Easterbrook have changed their minds by citing to *Continental Can* for other points of law.  For example, Defendants cite *Menasha Corp. v. News Am. Mktg., In-Store, Inc.*, 354 F.3d 661, 664 (7th Cir. 2004) (Easterbrook, J.), which cites *Continental Can* in rejecting an argument that physical distinctions between products necessitate a finding of separate relevant product markets.  We take no issue with that principle of law.  *Menasha* also states that "if the price of one [product] varies while others stay the same, then they probably are in different markets," *id.*, an important point that undermines Defendants' arguments here.

Brewers and Distillers, respectively.  For instance, the Court can ignore Defendants' baseless

contention that the *Owens-Illinois FTC Opinion* applied a "five percent threshold" under which a

relevant market for glass containers cannot exist for any "end-use where nonglass usage was at least

5% and at least one significant commercial customer used nonglass packaging."[64]  This test,

contrived by Defendants, appears nowhere in the Commission's opinion, and is untenable as a matter

of antitrust law.[65]  The relevant test is whether a hypothetical monopolist of glass containers sold to

Brewers and Distillers could profitably impose a "small but significant and non-transitory increase in

price," *Merger Guidelines* § 4.1.1, with a five percent price increase typically used as a threshold.

*Id*. § 4.1.2.  This test supports the Commission's relevant product markets here.

Defendants are wrong in suggesting that the Commission is "now revers[ing] course" in any

way.[66]  The Commission's position here is substantially consistent with the legal principles and

analytical approach it applied in the *Owens-Illinois FTC Opinion*, but the facts are quite different.

The relevant market for glass beer bottles – the largest market at issue here – was not at issue in

the *Owens-Illinois* case.[67]  As for spirits, in 1992, the Commission made an educated guess, based

on the evidence before it at that time, that emerging competition from plastic spirits containers would

likely constrain prices for glass spirits bottles.[68]  115 F.T.C. at 307.  Today, over twenty years later,

---

[64] Def. Br. at 12, 19.

[65] Thus, it was irrelevant to the Court's ruling in *H&R Block* whether more or less than five percent of taxpayers used a non-digital method of preparing a tax return, and it was irrelevant in *Staples* whether more or less than five percent of office supplies were sold outside of office supply superstores.  It is equally irrelevant here whether more or less than five percent of beer is packaged in cans.

[66] Def. Br. at 12.

[67] Thus, no weight attaches to Defendants' citation to dicta in the *Owens-Illinois P.I. Opinion* about demand elasticity in the market for beer containers, given the clear lack of evidence on that issue before the court.  Def. Br. at 11-12.  Even if there had been findings of fact related to beer containers in *Owens-Illinois*, only the factual record before the Court today is relevant here.

[68] In the *Owens-Illinois FTC Opinion*, the Commission found evidence that distillers were substituting plastic for glass in very small (50 ml) and very large (1.75 liter) liquor bottles—sizes that accounted for just 9% and 14%, respectively, of all distilled spirits containers.  115 F.T.C. at 220-21, 306-307.  As Defendants acknowledge, however, "the popular mid-sized containers were not converting yet."  Def. Br. 13.  Although the vast majority of spirits containers were in that mid-size range, the Commission marshaled no evidence beyond isolated anecdotes about producers who were "using or actively evaluating alternatives to glass for the mid-range sizes."  115 F.T.C. at

the record evidence shows that – contrary to the Commission's prediction based on the 1992 record – Distillers still predominantly use glass for their most popular, mid-sized spirits bottles.[69]  Economic analysis today shows that Distillers are unlikely to switch away from glass to other packaging materials sufficiently to defeat a SSNIP.[70]  Indeed, today's facts reveal ample evidence that the pricing of glass beer and spirits bottles is not closely constrained by competition from plastic or metal.  Case law since *Owens-Illinois* has emphasized the importance of such evidence.  *See, e.g.*, *Swedish Match*, 131 F. Supp. 2d at 158-59 ("[F]inding two products to be functionally interchangeable . . . does not end the analysis"; rather, one must proceed "to an analysis of cross-elasticity and price constraints in defining the relevant market"); *see also H&R Block*, 833 F. Supp. 2d at 55; *Staples*, 970 F. Supp. at 1080.  Here, the record evidence bearing directly on the cross-elasticity of demand between container types shows that the manufacture and sale of glass bottles to Brewers and Distillers are relevant product markets for assessing the proposed acquisition.

Ultimately, the *Owens-Illinois* Commission declined to enjoin the merger in that case because it found competitive responses from the remaining post-merger glass container suppliers, including five suppliers with multiple plants, would make anticompetitive effects unlikely in the relevant product markets.  115 F.T.C. at 323-26.  That rationale is irrelevant to this proposed merger to duopoly.  In any event, at this preliminary stage, there are clearly "serious, substantial" questions that are "fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals."  *Heinz*, 246 F.3d 714-15.

---

307.  The Commission cited no quantitative evidence, and made no findings of fact, regarding the magnitude of Distillers' cross-elasticity of demand for plastic versus glass containers.

[69] PX 2237-010.

[70] *See, e.g.,* PX 0006 (Warren-Boulton Expert Report) ¶¶ 64-65.

IV.    THE RELEVANT GEOGRAPHIC MARKET IS THE UNITED STATES.

Defendants do not contest that the relevant geographic market for Distillers is the United States,[71] and Defendants also concede that the relevant geographic market is no broader than the United States for Brewers.[72]  Thus, the only remaining question is whether the Commission has met its burden in identifying the United States as an appropriate geographic market for examining the transaction's effect on Brewers.  It has.

"[A]t this preliminary stage" prior to the merits trial, when the FTC is merely seeking interim relief under Section 13(b), the FTC does not "necessarily need to settle on a market definition" at all.  *Whole Foods*, 548 F.3d at 1036 (Brown, J.) (referring to both product market and geographic market); *see also CCC Holdings*, 605 F. Supp. 2d at 43.  In merger cases, the Supreme Court has defined the relevant geographic market as "the area in which the goods or services at issue are marketed to a significant degree by the acquired firm."  *United States v. Marine Bancorp.*, 418 U.S. 602, 620-21 (1974).  A relevant geographic market need only be "sufficiently defined so that the Court understands in which part of the country competition is threatened." *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 49 (D.D.C. 1998).  It "need not be identified with 'scientific precision,' or 'by metes and bounds as a surveyor would lay off a plot of ground.'"  *Id.* (quoting *United States v. Conn. Nat'l Bank*, 418 U.S. 656, 669 (1974) and *United States v. Pabst Brewing Co.*, 384 U.S. 546, 549 (1966)).

The FTC has sufficiently shown that the relevant geographic market is the United States. Moreover, Defendants have not identified any plausible alternative geographic markets for Brewers, other than vaguely asserting that the geographic markets are "local or perhaps regional"

---

[71] Def Br. at 25-30 (not contesting the FTC's geographic market for Distillers); *see also* Sanghvi Dep. at 194-95.

[72] Answer and Defenses of Defendant Ardagh Group S.A., ECF No. 39, ¶ 38.

without specifying how they would define them.[73]  Although the geographic footprint of each

Brewer may vary, most Brewers have similar competitive alternatives from which to choose

because Ardagh, Saint-Gobain, and O-I have plants located throughout the U.S. that are capable

of supplying Brewers.

 The map below illustrates the area where Ardagh and Saint-Gobain compete for the sale

of glass bottles to Brewers. This map was created by identifying each Ardagh or Saint-Gobain

plant that produced beer bottles in 2012, and then drawing a circle around each plant that

captures ▇ percent of that plant's beer bottle shipments.  The area shaded in red on the map is

the geographic area where <u>both</u> an Ardagh and Saint-Gobain circle overlap.  As is obvious from

the map, Ardagh and Saint-Gobain both market their beer bottles throughout the United States.[74]



Beer – ▇ Percentile Distance Overlaps Between Ardagh and Verallia - 2012

---

[73] Def. Br. at 27.

[74] PX 0014 (Expert Rebuttal Report of Dr. Frederick Warren-Boulton) ¶ 29.

Slicing up the geographic market into "local or perhaps regional" markets would be inaccurate because beer bottles are shipped much farther than the Defendants would like this Court to believe.  In 2012, approximately ■ percent of the beer bottles produced by Ardagh, Saint-Gobain, and O-I were shipped over 500 miles.[75]  Thus, any attempt to define narrow, localized markets would be arbitrary and in direct conflict with numerous actual examples of Brewers receiving glass bottles from "outside" their geographic market.  It would also result in inaccurate market share calculations.  *See Cardinal Health*, 12 F. Supp. 2d at 50-51 (finding a national market and rejecting various "regional" markets in part because of evidence of customers purchasing from locations beyond the claimed boundaries of the regional markets).  Unsurprisingly, in their business documents, Defendants routinely calculate market shares or analyze competition for the *United States*, rather than "local or perhaps regional" markets.[76]

Thus, Defendants' flawed geographic market arguments should be rejected.  At best, these arguments only raise more questions that are "so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals."  *Heinz*, 246 F.3d at 714-15.

## V.    THE TRANSACTION WILL LIKELY LEAD TO REDUCED COMPETITION AND HIGHER PRICES.

The proposed acquisition will increase the HHIs in the relevant market for glass beer bottles by 782 to 3,657 and for glass spirits bottles by 1,072 to 3,138.[77]  These increases easily establish the presumption that the acquisition is unlawful.  *See Heinz*, 246 F.3d at 716.  The heavy burden of rebutting that presumption falls to Defendants, *id.* at 715, and, in this Section 13(b) action, the Court must issue the preliminary injunction unless the rebuttal arguments

---

[75] PX 0014 (Expert Rebuttal Report of Dr. Frederick Warren-Boulton) ¶ 28.

[76] PX 1264-022; PX 2078-012, -013; PX 1033-009; PX 1021; PX 1535; PX 2000-292.

[77] *See* FTC Br., Argument, Section II.C.1.

extinguish all the "serious, substantial" questions of legality raised by this acquisition.  *Id.* at 725.

### A.  There Are Extraordinarily High Barriers To Entry and Expansion.

Defendants do not contest the fact that there are extraordinarily high barriers to entry and expansion in this industry.[78]  Thus, the Court should treat high entry barriers as conceded.

### B.  The Proposed Acquisition Will Eliminate Head-to-Head Competition Between Ardagh and Saint-Gobain.

Unable to deny that Ardagh and Saint-Gobain directly compete with each other, Defendants claim instead that they do not "meaningfully" compete or that their competition is "limited."[79]  These disavowals are incompatible with how Defendants behave and analyze competition in the ordinary course of business,[80] and rest on the contrived analysis of Defendants' economist.[81]  Defendants ask the Court simply to ignore the head-to-head competition between them.  For example, in the past year, Defendants competed for a major contract to supply ███████████████████████████████████████████

████████  Yet Defendants dismiss this competition in a footnote as not rising to some undefined threshold "level" worthy of consideration, even though their own economist described the competition between Ardagh and Saint-Gobain for the contract as "vigorous."[83]  In *Heinz*, the D.C. Circuit dispatched a similar argument in which two competitors denied competing, noting that there was "record evidence that the two [firms] do in fact price against each other" and that

---

[78] *See generally* Def. Br.

[79] Def. Br. at 31-33.

[80] *See supra*, Section II.B; FTC Br., Statement of Facts, Section III; FTC Br., Argument, Section II.C.3.

[81] *See* Def. Br. at 31-33 n.75-78, 80-82 (citing Sanghvi Report).

[82] ████████████████████████████████

[83] *See* Def. Br. at 33 n.80; Sanghvi Report ¶ 225.

their competition had resulted in lower prices.  246 F.3d at 718.  The facts are similar here, and the outcome should be too.

### C.  The Relevant Markets Are Ripe For Coordination.

Defendants also assert that coordinated anticompetitive effects would be unlikely because of market characteristics like the presence of certain large buyers, the existence of long-term contracts, and other supposed barriers to coordination.  The potential barriers to coordination Defendants identify lose their force where, as here, the relevant markets will be concentrated down to a duopoly with each competitor facing only one rival firm.  In any event, none of these arguments eliminate all the "serious, substantial" questions of legality.

In *CCC Holdings*, the Court granted a preliminary injunction despite nearly identical arguments about buyer power and long-term contracts.  605 F. Supp. 2d at 64.  In that case, like here, "Defendants ignore[d] a number of other factors present in these markets that would tend to confirm the HHI's predictions regarding the likelihood of coordination," *id.*, such as the many factors conducive to coordination discussed in our opening brief.  *See* FTC Br. at 36-39.  Indeed, the Commission's case here is even stronger than in *CCC Holdings*, since Defendants here do not even contest the industry's extraordinarily high barriers to entry.  *Cf. CCC Holdings*, 605 F. Supp. 2d at 47-60 (discussing entry).

Defendants' arguments about the size of their customers are overstated.

 can manufacturing options, cited by Defendants, are irrelevant by definition, since cans are outside the relevant market.

---

[84]

███████████████████████████████████████████████████████

Furthermore, the size of large customers does nothing to protect the interests of smaller customers who may also be harmed by the post-acquisition duopoly. *See Merger Guidelines* § 8.

Defendants' other structural arguments can be dismissed too.[86]  With only two Majors remaining after the transaction, the firms will be able to reach an agreement and to detect and punish cheating almost by default.  If one duopolist loses a customer, it immediately knows (1) to whom it lost the customer and (2) that the lone other firm offered a better deal.[87]  The Court can simply ignore Defendants' references to irrelevant facts, such as Anchor's bankruptcies, which occurred prior to 2006, and O-I's stock price, which has roughly doubled in the past two years.

### D.  Defendants' Speculative Efficiencies Claims Fail.

Defendants make no effort to explain how their claimed efficiencies are (1) merger-specific and (2) verifiable, as required by case law and the Merger Guidelines.  *See H&R Block*, 833 F. Supp. 2d at 89; *Heinz*, 246 F.3d 721-22; *Merger Guidelines* § 10.  Instead, Defendants invent *their own standard* for evaluating efficiencies claims (without citing any supportive case law), and then proceed to argue that they have satisfied this novel standard.[88]  Such arguments are frivolous and require no response beyond the points in our opening brief.[89]

---

[85] *See* FTC Br. at 43; Def. Br. at 35 n. 90.

[86] *See* PX 0014 (Rebuttal Expert Report of Dr. Frederick Warren-Boulton) ¶¶ 32-36.

[87] *See* PX 0014 (Rebuttal Expert Report of Dr. Frederick Warren-Boulton) ¶ 35.

[88] Def. Br. at 41-42.  Defendants incorrectly claim their invented standard is "consistent" with the Merger Guidelines.  *See id.* n.107.  "If a company could achieve certain cost savings without any merger at all, then those stand-alone cost savings cannot be credited as merger-specific efficiencies. The defendants must show that their 'efficiencies . . . cannot be achieved by either company alone because, if they can, the merger's asserted benefits can be achieved without the concomitant loss of a competitor.'"  *H&R Block*, 833 F. Supp. 2d at 90 (quoting *Heinz*, 246 F.3d at 722); *accord Merger Guidelines* § 10 n.13 ("The Agencies will not deem efficiencies to be merger-specific if they could be attained by practical alternatives that mitigate competitive concerns . . . .").

[89] Defendants also accuse the FTC of employing "tortured" new "definitions" for the legal requirements for efficiencies claims – definitions which Defendants themselves seem to have invented since they appear nowhere in the FTC's brief.  *See* Def. Br. at 41 (quoting "definitions" that the FTC purportedly "employs").

## VI.     THE EQUITIES STRONGLY FAVOR PRELIMINARY RELIEF.

Defendants do not identify any compelling public equities that favor allowing their acquisition to close before trial.  Their flawed equities arguments ignore the public interest in favor of private ones and draw on merits arguments that have no place in the equities analysis. First, despite Defendants' unequivocal representation to the FTC administrative law judge that they would litigate the merits trial, Defendants now suggest that preserving the status quo through the merits trial "may" scuttle their deal.[90]  Yet Defendants nowhere explain why they cannot extend the timing of their agreement.  Indeed, their executives' testimony suggests they would have a continuing interest in the deal.[91]  Ultimately, Defendants' shifting positions matter little because their private interest in closing their deal cannot outweigh the public interest of preserving competition.  *See Heinz*, 246 F.3d at 727 n.25 ("Private equities do not outweigh effective enforcement of the antitrust laws.") (citation omitted).  Second, Ardagh's plans to eliminate Saint-Gobain as a competitor and merge Saint-Gobain's assets with its own strongly favor interim relief.  *See Swedish Match*, 131 F. Supp. 2d at 173 (absent an injunction, it will be "impossible to accomplish full relief . . . the eggs will be irreparably scrambled.").  Defendants' remaining "equities" (i.e., that the deal poses little risk to competition and will generate efficiencies) are no more than restated merits arguments which, as explained above, fail.

## CONCLUSION

For the reasons explained above and in Plaintiff's opening brief, the Federal Trade Commission respectfully requests that this Court grant its motion for a preliminary injunction and prevent Ardagh from closing its acquisition of Saint-Gobain pending a full administrative trial to determine the legality of the acquisition under the antitrust laws.

---

[90] Def. Br. at 44.

[91] Coulson Dep. at 64-65 ("Q. If the deal is still pending mid-January, does Ardagh intend to continue to pursue the acquisition? A.Yes."); Wall Dep. at 178-79; Grewe Dep. at 29.

October 23, 2013

Of counsel:

DEBORAH L. FEINSTEIN (D.C. Bar 412109)
Director
NORMAN A. ARMSTRONG, JR. (D.C. Bar 459621)
Deputy Director
Bureau of Competition
Federal Trade Commission

JONATHAN NUECHTERLEIN (D.C. Bar 442470)
General Counsel
Federal Trade Commission

CATHARINE M. MOSCATELLI
Assistant Director (D.C. Bar 418510)

BRENDAN J. MCNAMARA
Deputy Assistant Director

ANGELIKE A. MINA
SEAN D. HUGHTO (D.C. Bar 421224)
STEVEN L. WILENSKY (D.C. Bar 430398)
MONICA M. CASTILLO
ANGEL PRADO
JAMES ABELL (D.C. Bar 990773)
MEREDITH ROBINSON (D.C. Bar 498245)
JOSHUA GOODMAN
MICHAEL FRANCHAK
STEVEN DAHM
DANIELLE SIMS (D.C. Bar 982506)
KRISTIAN ROGERS
AMANDA HAMILTON (D.C. Bar 499646)
SEBASTIAN LORIGO
VICTORIA LIPPINCOTT (D.C. Bar 473839)
ERIC SPRAGUE
MICHAEL LOVINGER (D.C. Bar 990801)
JONATHAN MINCER

Attorneys

Federal Trade Commission
Bureau of Competition
Mergers II Division

Respectfully submitted,


/s/ Edward D. Hassi

EDWARD D. HASSI
Chief Litigation Counsel
Federal Trade Commission

*Bureau of Competition*
600 Pennsylvania Ave., NW
Washington, DC 20580
Telephone: (202) 326-2470
Facsimile: (202) 326-2884
Email: ehassi@ftc.gov

*Attorney for Plaintiff*